UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

BASILIA RICCIARDO,

                         Plaintiff,

        v.

NYU HOSPITALS CENTER and NYU LANGONE
HOSPITAL-LONG ISLAND,

                       Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
22-CV-4952 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Basilia Ricciardo commenced the above-captioned action against Defendants NYU Hospitals Center and NYU Langone Hospital – Long Island[1] on the basis of federal question jurisdiction, asserting claims of disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and retaliation under the Family Medical Leave Act, 29 U.S.C. § 2611 *et seq.* (the "FMLA").  (Compl. ¶¶ 50–72, Docket Entry No. 1.) Plaintiff alleges Defendants fired her because of her disability and in retaliation for taking FMLA leave and falsely claimed the termination was due to her sleeping or appearing to be asleep on April 12, 2021 "against [the Defendants'] conduct of employees policy."  (*Id.* ¶¶ 49, 54, 56, 62, 67, 68.)  On October 17, 2022, Defendants answered the Complaint and asserted several affirmative defenses.  (Answer ¶¶ 50–72, Docket Entry No. 9.)

---

     [1]  Defendants note that NYU Hospitals Center should be named NYU Langone Hospitals ("NYULH") and that NYULH should be the sole named defendant because NYU Langone Hospital – Long Island is part of NYULH and not a separate corporate entity.  (Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 1, Docket Entry No. 28-1; Defs.' Reply in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply") 1 n.1, Docket Entry No. 28-83.)

Currently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure; Plaintiff opposes the motion.[2]  For the reasons discussed below, the Court grants Defendants' motion as to Plaintiff's ADA and FMLA claims and declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claim.

---

[2]  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 28; NYULH Emp. Handbook, annexed to Defs.' Mot. as Ex. C, Docket Entry No. 28-6; Oct 2014 Hum. Res. Pol'ys & Procs. Manual, annexed to Defs.' Mot. as Ex. D, Docket Entry No. 28-7; Hum. Res. Pol'ys & Procs. Chapter 4: Workplace Conduct, annexed to Defs.' Mot. as Ex. E, Docket Entry No. 28-8; April 2021 Hum. Res. Pol'ys & Procs. Chapter 1014: Attendance & Lateness, annexed to Defs.' Mot. as Ex. F, Docket Entry No. 28-9; Apr. 12, 2021 Disciplinary Action Notice, annexed to Defs.' Mot. as Ex. S, Docket Entry No. 28-22; April 13, 2021 Email, annexed to Defs.' Mot. as Ex. V, Docket Entry No. 28-25; Apr. 14, 2021 Text Message, annexed to Defs.' Mot. as Ex. Y, Docket Entry No. 28-28; Apr. 14, 2021 E-mail, annexed to Defs.' Mot. as Ex. Z, Docket Entry No. 28-29; Apr. 14, 2021 Emails 001515, annexed to Defs.' Mot. as Ex. BB, Docket Entry 28-31; Apr. 15, 2021 Text Message, annexed to Defs.' Mot. as Ex. EE, Docket Entry 28-34; Apr. 22, 2021 Email, annexed to Defs.' Mot. as Ex. MM, Docket Entry 28-42; Notification of FMLA Request, annexed to Defs.' Mot. as Ex. NN, Docket Entry No. 28-43; CIGNA Leave Status Determination Ltr., annexed to Defs.' Mot. as Ex. OO, Docket Entry No. 28-44; Final Termination Ltr., annexed to Defs.' Mot. as Ex. RR, Docket Entry No. 28-47; Decl. of Derek Forte in Supp. of Defs.' Mot. ("Forte Decl."), annexed to Defs.' Mot. as Ex. WW, Docket Entry 28-88; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), annexed to Defs.' Mot., Docket Entry No. 28-50; Equal Employment Opportunity Charge, annexed to Defs.' Mot. as Ex. 1, Docket Entry No. 28-53; Basilia Ricciardo Dep. Tr. ("Ricciardo Tr."), annexed to Defs.' Mot. as Ex. 3, Docket Entry No. 28-55; Genevieve Ramclam Dep. Tr. ("Ramclam Tr."), annexed to Defs.' Mot. as Ex. 4, Docket Entry No. 28-56; Dorothy Gionesi Dep. Tr. ("Gionesi Tr."), annexed to Defs.' Mot. as Ex. 6, Docket Entry No. 28-58; Texts Messages & Voicemail, annexed to Defs.' Mot. as Ex. 7, Docket Entry No. 28-59; Emails, NYULH 000344-46, annexed to Defs.' Mot. as Ex. 8, Docket Entry No. 28-60; Emails, NYULH 001515-1526, annexed to Defs.' Mot. as Ex. 10, Docket Entry No. 28-62; Emails, NYULH 000144-146, annexed to Defs.' Mot. as Ex. 12, Docket Entry No. 28-64; Emails, NYULH 000308-310, annexed to Defs.' Mot. as Ex. 14, Docket Entry No. 28-66; Emails, annexed to Defs.' Mot. as Ex. 17, Docket Entry No. 28-69; Tisa Hall Dep. Tr. ("Hall Tr."), annexed to Defs.' Mot. as Ex. 21, Docket Entry No. 28-73; Termination Approval, annexed to Defs.' Mot. as Ex. 27, Docket Entry No. 28-79.)

Because the exhibits except for deposition transcriptions are not paginated consistently, the Court refers to the page numbers assigned by the electronic filing system.

## I.    Background

On or about July 9, 2018, Defendants hired Plaintiff as a full-time Physician Assistant.[3] (Defs.' 56.1 ¶ 1; Pl.'s Counter 56.1 ¶ 4.)  Plaintiff began her employment at Defendants' Glen Cove Primary Care Ambulatory Practice at NYU Langone Hospital – Long Island.  (Defs.' 56.1 ¶ 2; Pl.'s Counter 56.1 ¶ 6.)  In or around October of 2018, Defendants transferred Plaintiff to NYU Langone Medical Associates – Carle Place Family Medicine Practice ("Carle Place"). (Defs.' 56.1 ¶ 3.)  Genevieve Ramclam, Practice Manager at Carle Place, Faculty Group Practice, directly supervised Plaintiff.  (Defs.' 56.1 ¶¶ 3, 5; Pl.'s Counter 56.1 ¶ 7.)  Plaintiff's responsibilities as a Physician Assistant included providing direct medical care and treatment for scheduled patients.  (Defs.' 56.1 ¶ 4; Pl.'s Counter 56.1 ¶ 5.)

### a.    Defendants' human resources policies and procedures

At the start of her employment, Plaintiff received, reviewed, and signed Defendants' Employee Handbook.  (Defs.' 56.1 ¶ 7.)  The Employee Handbook provides that "[e]mployees who have chronic absence or lateness habits will be subject to the discipline process" and refers to the Defendants' Human Resources Policies & Procedures ("HRPP").  (Ex. C at 12; Defs.' 56.1 ¶ 6.)  Policy 1014 of the HRPP governs attendance and the version in effect at the start of Plaintiff's employment provided that "habitual absence or lateness may be cause for corrective action, up to and including discharge" and included the following four-step Disciplinary Action process that would "progressively escalate[]" with each infraction within a 12-month period: (1) verbal counseling, (2) written warning, (3) final written warning/suspension, and (4) termination

---

[3]  (Defs.' 56.1 Stmt., Docket Entry No. 28-2; Pl.'s Resp. to Defs.' 56.1 & Pl.'s 56.1 Counterstatement, Docket Entry No. 28-51; Defs.' Reply to Pl.'s 56.1 Resp. ("Defs.' 56.1") & Defs.' Reply to Pl.'s Counter 56.1 ("Pl.'s Counter 56.1"), Docket Entry No. 28-84.)  The facts are undisputed unless otherwise noted.

("Attendance Policy"). (Ex. D at 2, 4; Defs.' 56.1 ¶¶ 7–8.) Defendants revised the Attendance Policy in April of 2021 to similarly "require[ ] that a manager address an employee's absenteeism and/or lateness in a progressive manner that moves to more serious forms of corrective action if the absenteeism and/or lateness continues," with "the last step in the process" being "termination of employment." (Ex. F at 8; Defs.' 56.1 ¶¶ 11–12.)

Policy 4.6 of the Defendants' HRPP sets forth "Rules of Conduct" and the version in effect from January of 2021 through the end of Plaintiff's employment with Defendants provides that certain infractions including "[s]leeping, or the appearance thereof, while on duty" "may lead to disciplinary action . . . up to and including termination when deemed appropriate" ("Workplace Conduct Policy"). (Ex. E at 2–3; Defs.' 56.1 ¶ 10.) The Workplace Conduct Policy provides a "Step-by-Step Procedure" for addressing the infractions that directs "supervisors [to] contact Employee & Labor Relations prior to taking disciplinary action against an employee in order to make a proper determination regarding how to address what has occurred." (Ex. E at 3.) The Workplace Conduct Policy states that "[n]othing in this policy shall serve to modify in any way [NYULH'S] employment-at-will policy." (Id.) Defendants' human resources ("HR") department has final approval authority on terminations. (Pl.'s Counter 56.1 ¶ 59.)

**b. Plaintiff's health challenges and reduced work schedule.**

Plaintiff suffers from complex migraines and diabetes and takes medication for her conditions. (Id. at ¶¶ 1–2.) She shared with Ramclam and others at Carle Place her medical conditions and that she had survived breast cancer. (Id. ¶ 10.) Ramclam's supervisor, Assistant Regional Director Linda Palazzotto, also knew that Plaintiff suffered from a neurological condition and complex migraines. (Id. ¶ 13.) From at least November of 2018, Defendants approved Plaintiff working a reduced work schedule of four days per week on Monday, Tuesday, Thursday, and Friday starting at 8:30 A.M. due to her medical conditions. (Defs.' 56.1 ¶ 15;

Pl.'s Counter 56.1 ¶ 12.)  Plaintiff told Ramclam and others at Carle Place that she went to

doctor's appointments on her day off.  (Pl.'s Counter 56.1 ¶ 10.)

In January of 2021, Plaintiff underwent cataract surgery and Defendants granted her

request for FMLA leave from December 31, 2020 to February 2, 2021.  (Defs.' 56.1 ¶ 16.)

Plaintiff subsequently returned to work, maintained her reduced work schedule, and did not

request an additional reduction in hours or other change to her schedule.  (*Id.* ¶ 17; Ricciardo Tr.

74:10–75:3.)

### c.  April 12, 2021 incident

In April of 2021, Carle Place was undergoing renovations to create new and refurbished

patient rooms.  (Defs.' 56.1 ¶ 33; Pl.'s Counter 56.1 ¶ 15.)  Due to the ongoing construction,

Defendants assigned Plaintiff a patient examination room as a temporary office.  (Defs.' 56.1

¶ 33; Pl.'s Counter 56.1 ¶ 15.)

On April 12, 2021, Plaintiff reported to work late.  (Defs.' 56.1 ¶¶ 34–35.)  Subsequently,

Ramclam prepared a Disciplinary Action Notice for Plaintiff's "[f]ailure to follow Policies &

Procedures" that addressed Plaintiff's late arrival on April 12, 2021, as well as Plaintiff arriving

three minutes late on March 16, 2021 and two minutes late on March 29, 2021.  (Ex. S at 2;

Defs.' 56.1 ¶ 36.)  The Disciplinary Action Notice indicated that "[f]ailure to improve will result

in further disciplinary action up to and including termination."  (Ex. S at 2.)

Later that same day, some time after lunch, Plaintiff "suddenly got an explosive

migraine" and took medication.  (Pl.'s Counter 56.1 ¶ 16.)  After taking her medicine, Plaintiff

vomited and laid down on the examination table "because of her gait" and because she was

"afraid" as "[e]verything happened so quickly."  (*Id.* ¶¶ 18, 21.)  Plaintiff was unable to call the

front desk to communicate that she was not feeling well because the phone in the patient

examination room did not work due to the ongoing construction.  (*Id.* ¶ 17.)  Plaintiff turned off

the light to mitigate the auditory and light sensitivity she was experiencing due to the migraine. (*Id.* ¶ 19.)  She left the door ajar and laid on her side so that she did not aspirate and closed her eyes.  (*Id.* ¶ 20; Ricciardo Tr. 139:10–23; *see* Ex. 1 ¶ 31.)

Around the same time, Dorothy Gionesi, Office Assistant at Carle Place, received a call on the main office number from a patient requesting to speak with Plaintiff.  (Defs.' 56.1 ¶ 38; Pl.'s Counter 56.1 ¶ 22; Gionesi Tr. 44:6–45:19.)  Carle Place did not have a paging system or intercom system, and it was Gionesi's general practice even before the renovations to search for Plaintiff when she needed to get in touch with her.  (Pl.'s Counter 56.1 ¶¶ 9, 22.)  Gionesi placed the call on hold to look for Plaintiff and eventually located her in her temporary office with the door slightly ajar and the lights off.[4]  (Pl.'s Counter 56.1 ¶ 23; Defs.' 56.1 ¶ 40.)  Gionesi knocked, called out Plaintiff's name quietly, and receiving no response, knocked again after a few moments, opened the door a little more, and called out Plaintiff's name in a louder voice, at which point, Plaintiff got off of the examination table.  (Gionesi Tr. 48:9–49:3, 52:2–15; Pl.'s Counter 56.1 ¶¶ 23–24; Defs.' 56.1 ¶ 41.)  Gionesi stood at the door the entire time, never entered the room, and testified that she could not see Plaintiff's face nor if Plaintiff's eyes were closed.  (Pl.'s Counter 56.1 ¶ 24; Gionesi Tr. 49:12–25.)  When Plaintiff came out of the room, she explained to Gionesi that she had a migraine.  (Pl.'s Counter 56.1 ¶¶ 24–25.)

---

[4]  There is conflicting evidence in the record as to whether Gionesi called Plaintiff before searching for her.  Ramclam testified that Gionesi told her that "she tried to contact [Plaintiff] via telephone" before searching for her but that "there was no answer."  (Ramclam Tr. 133:16–22.)  Gionesi testified that she did not try to call Plaintiff from the front desk because she did not know Plaintiff's temporary office location and testified that it was customary practice to look for Plaintiff when she had a call because there was no intercom system in place and that she never attempted to transfer a call to Plaintiff nor did she recall telling Ramclam that she attempted to page Plaintiff.  (Defs.' 56.1 ¶ 38; Pl.'s Counter 56.1 ¶ 22; Gionesi Tr. 53:14–55:12, 60:24–61:8, 61:9–13, 63:12–20.)  The parties rely on Gionesi's account in their respective 56.1 statements. (Pl.'s Counter 56.1 ¶ 22; Defs.' 56.1 ¶ 40.)

6

Gionesi returned to her workstation and immediately relayed the incident to Karen Hill, another office assistant. (Pl.'s Counter 56.1 ¶ 26; Defs.' 56.1 ¶ 42.) Hill told Gionesi that she was going to report the incident to Ramclam and Gionesi asked her not to report it because "[she] thought it was odd that [she] found [Plaintiff] in the room," that there was never an occasion prior to that where she looked for Plaintiff and found her laying on an examination table, and "didn't want anybody to get in trouble." (Gionesi Tr. 58:20–59:21; Pl.'s Counter 56.1 ¶ 27.) Hill reported the incident to Ramclam. (Pl.'s Counter 56.1 ¶ 28; Defs.' 56.1 ¶ 42; Gionesi Tr. 58:20–25.) Ramclam then confirmed the incident with Gionesi.[5] (Defs.' 56.1 ¶ 43; Pl.'s Counter 56.1 ¶ 29; Gionesi Tr. 60:19–23:61–8; *id.* at 40:20–24, 43:19–44:2.)

After speaking with Gionesi, Ramclam approached Plaintiff about the incident and told her that an employee found her sleeping. (Defs.' 56.1 ¶ 43; Ricciardo Tr. 97:8–21.) Plaintiff told Ramclam that she was not sleeping. (Pl.'s Counter 56.1 ¶ 31; Defs.' 56.1 ¶ 44.) Plaintiff informed Ramclam that she had gotten sick, had a migraine, could not call her, had to lay down, and had to take medication immediately for the migraine.[6] (Pl.'s Counter 56.1 ¶ 30.) Ramclam

---

[5] Although the undisputed facts in the parties' respective 56.1 statements indicate that Hill initially reported the incident to Ramclam and Ramclam then approached Gionesi to confirm what Hill had told her, (*see* Defs.' 56.1 ¶¶ 42–43; Pl.'s Counter 56.1 ¶¶ 28–29), Ramclam testified that Gionesi went to Ramclam to report what she had seen and made no mention of Gionesi reporting the incident to Hill initially. (Ramclam Tr. 129:24–130:6.) Gionesi denied going directly to Ramclam to report the incident and testified that Ramclam approached her to discuss what Hill had reported to her. (Gionesi Tr. 40:20–42:23.)

[6] The parties dispute the rest of Ramclam and Plaintiff's conversation. Defendants contend based on Ramclam's deposition testimony that (1) Ramclam told Plaintiff that it was reported that she was found sleeping or appearing to be sleeping, and Plaintiff responded "Yes, I know"; (2) that "Plaintiff then indicated she was fine when Ramclam asked about her headache and changed the subject of the conversation to patient scheduling"; and (3) Plaintiff was "dismissive" and "unapologetic" after Ramclam gave her the written warning. (Defs.' 56.1 ¶ 46; Pl.'s Counter 56.1 ¶ 31; Ramclam Tr. 159:9–19, 160:16–25.) Plaintiff denies Ramclam's account and contends that she apologized to Ramclam for getting sick at work and told Ramclam that she was not sleeping. (Pl.'s 56.1 Resp. ¶ 44; Pl.'s Counter 56.1 ¶ 31; Ricciardo Tr. 98:4–22–

gave Plaintiff the previously drafted Disciplinary Action Notice addressing Plaintiff's attendance and timeliness issues.[7]  (Defs.' 56.1 ¶ 47.).

### d.    Actions by Plaintiff and Defendants after the April 12, 2021 incident

### i.    April 13, 2021

The next day, on April 13, 2021 at 6:34 A.M., Plaintiff texted Ramclam that she would be taking a sick day because she had a headache, writing "I am sick as I told you yesterday I had a bad migraine during work [but was] not sleeping as someone reported to you.  I am taking a sick day today 4/13/21 because I am having a severe headache and difficulty walking must go for medical care."  (Ex. 7 at 2; Defs.' 56.1 ¶ 49; *see* Pl.'s Counter 56.1 ¶ 32.)  Ramclam shared the text message with Palazzotto, Senior Director of HR Karin Wiesenberger, and two HR Generalists, Mariel Kimura and Caroline Rodriguez.  (Pl.'s Counter 56.1 ¶¶ 34, 42, 45.)

The same day at approximately 11:23 A.M., Ramclam emailed Kimura and Rodriguez, copying Palazzotto, that she had shared the signed Disciplinary Action Notice with Plaintiff and reported the April 12, 2021 incident as follows:

> Due to current renovations at the practice, [Plaintiff] was utilizing [an] exam room C as her office for the day.  On 4/12/21 at approximately 3:00pm, a front desk staff reports that a patient called in to speak to [Plaintiff].  When she did not get a response over the phone, she proceeded to [Plaintiff's] seating area to tell her there is a patient on the phone returning her call.  She reports that the lights were off in the room and she found [Plaintiff] laying on the exam

---

99:4, 99:14–100:7.)  Defendants' dispute that Plaintiff apologized and said she was not sleeping. (Pl.'s Counter 56.1 ¶ 31.)

[7]  The parties dispute when Ramclam gave Plaintiff the Disciplinary Action Notice. Defendants rely on Ramclam's testimony and assert that Ramclam did not give Plaintiff a written warning for being late when she conversed with Plaintiff about the April 12, 2021 incident but may have handed Plaintiff the warning "soon after."  (Ramclam Tr. 160:5–12; Defs.' 56.1 ¶ 47.) Plaintiff testified that Ramclam gave her the notice "at the same time" the two discussed the incident.  (Ricciardo Tr. 97:8–100:7; Pl.'s 56.1 Resp. ¶ 47.)

table, sleeping.[8]  She called out her name which startled her and she quickly sat up.

When asked about the matter, [Plaintiff] stated "I was not sleeping, I was 'getting a headache and decided to close my eyes.[']"  I asked if she was ok or if she needed anything to which she responded "yes, I am fine, I was just getting a headache[.]"

I explained to [Plaintiff] that it was not appropriate, especially when the staff find a provider in this position during work hours. [Plaintiff] was very dismissive stating "I know, I understand" and proceeded to change the subject to the 4pm patient who appeared to be a late or a no show."

(Ex. V at 2; Defs.' 56.1 ¶ 48; Pl.'s Counter 56.1 ¶ 44.)  Kimura forwarded Ramclam's email to Weisenberger, writing, "[s]haring this with you . . . in addition to being issued a written warning for lateness, [Plaintiff] was discovered laying on an example [sic] table during work hours by another employee" and noting that she had advised Ramclam "yesterday to question [Plaintiff] regarding this incident" and to "mention/ensure that no retaliation occurs since the witness is another employee in the practice."  (Ex. 8 at 3; Pl.'s Counter 56.1 ¶ 45.)  Kimura shortly thereafter responded to Ramclam that she and Weisenberger spoke and agreed that Plaintiff's conduct warranted a "written warning" because Plaintiff "was sleeping while on duty," "failed to communicate with her manager that she needed a break (if that is in fact what she needed)," and "if she only had her eyes closed, then how did she not hear the call from the front desk or the employee entering her temporary office for the day?"  (Ex. 8 at 2; Defs.' 56.1 ¶ 50; Pl.'s 56.1 Resp. ¶ 47).  Kimura noted in her email that it was "also concerning that [Ramclam's] perception

---

[8]  The evidence before the Court is inconsistent as to whether Gionesi reported to Ramclam that Plaintiff was asleep as Ramclam's email indicates.  Gionesi testified that when she found Plaintiff in the patient exam room, Gionesi stood at the door the entire time, never entered the room, and could not see Plaintiff's face nor if Plaintiff's eyes were closed.  (Gionesi Tr. 49:12–25.)  She also testified that she did not recall telling Hill that she saw Plaintiff sleeping and that she relayed to Ramclam the same information she told Hill.  (Gionesi Tr. 49:12–25, 57:18–58:19.)  Ramclam testified that Gionesi told her that Plaintiff "appeared to be sleeping" when Gionesi found her.  (Ramclam Tr. 133:16–23; id. at 135:9–11.)

is that [Plaintiff] was dismissive and unapologetic about the situation."[9]  (Ex. 8 at 2.)

### ii.   April 14, 2021

The next day, April 14, 2021, Plaintiff left Ramclam a message that she would not be coming into work that day, was going to obtain a Magnetic Resonance Imaging (MRI) scan of her brain, and that her neurologist informed her that she could not work until the MRI results were available.  (Defs.' 56.1 ¶ 56; Ex. Y at 2; Ex. Z at 3.)  Ramclam later reported to Palazzotto that she advised Plaintiff to contact HR to initiate the FMLA process.  (Defs.' 56.1 ¶ 57; Ex. Z at 2–3.)

That same morning, at approximately 10:02 A.M., Weisenberger emailed David Kaplan, Senior Director for Ambulatory Operations, copying Tisa Hall, Director of the Faculty Ambulatory Group Practice, writing:

> David[,] the [Physicians Assistant] in Family Practice that there is consideration of eliminating the position [for] was hired July 2018. She is the only mid-level in the practice.  So as it turns out this does not matter.  We may be able to manage her out.  She is currently written up for excessive lateness.  Checking her record we are talking 15 minutes to one hour or more.  Yesterday they found her asleep on the exam room (also serving as her office during construction) table.  A patient called to speak with her and they paged her . . . no answer.  Front desk went to look for her and found her asleep.  When she went up to her she appeared asleep. When she called her name loudly she jumped up.  She claims not be sleeping but rather she felt headache coming on.  She was resting[] her eyes because of headache.   Once again she failed to alert the manager that she needed a break.  If not asleep why did she not answer the page.  We can talk about what our plan to exit can be let me know when you have some time.

(Ex. BB at 2; Defs.' 56.1 ¶ 52; Pl.'s Counter 56.1 ¶ 52.)  Kaplan forwarded Weisenberger's email to Joshua Swirnow, NYULH Vice President, writing "[s]ee below for the [Physicians

---

[9] As discussed *supra*, *see* note 6, Plaintiff disputes that she was dismissive when Ramclam confronted her about the April 12, 2021 incident and testified that she apologized to Ramclam for getting sick at work and told Ramclam that she was not sleeping.  (Pl.'s Counter 56.1 ¶ 31; Defs.' 56.1 ¶ 44.)

Assistant] at Carle Place.  Unreal" and noting that he "spoke with [Weisenberger] and told her enough is enough, this person needs to be terminated for her ridiculous behavior" and that "[Weisenberger] agreed and is working on this now."  (Ex. BB at 3; Defs.' 56.1 ¶¶ 53–54; Pl.'s Counter 56.1 ¶¶ 54, 56.)  Swirnow responded "terminate."  (Ex. BB at 3; Defs.' 56.1 ¶ 54.) Kaplan forwarded Swirnow's response to Hall, noting that he "spoke to Karin and . . . think she is moving ahead with termination, but don't want her wavering on this, see [Swirnow's] email below.  Any help to ensure this happens will be appreciated."  (Defs.' 56.1 ¶ 55; Pl.'s Counter 56.1 ¶ 57; Ex. 10 at 7.)  Kaplan did not have the authority to terminate an employee without receiving approval from HR.  (Pl.'s Counter 56.1 ¶¶ 59–60.)

At 12:11 P.M., Palazzotto emailed Kaplan and HR Senior Director of Ambulatory Operations Jean-Marie Addeo that Plaintiff had informed her that she was "gravely ill," "getting an MRI of the brain," and "not sure when she will be back."  (Ex 10 at 4; Defs.' 56.1 ¶ 60; Pl.'s Counter 56.1 ¶ 64.)  Palazzotto noted she told Plaintiff "that if she did not feel well she should have communicated with the practice manager so [Ramclam] would have been aware prior so an incident could have been avoided" and "to contact [Ramclam] if she would not be reporting to work" the next day.  (Ex 10 at 4.)  She forwarded the email thread from April 13, 2021 among herself, Ramclam, Weisenberger, Kimura, Rodriguez, where Ramclam initially reported the April 12, 2021 incident and Kimura stated that she and Weisenberger had agreed that Plaintiff's conduct warranted a written warning. (*Id.* at 4–6.)  Kaplan forwarded Palazzotto's email to Hall, writing "[Palazzotto] just sent me this.  I suspect this will come up."  (*Id.* at 4; Pl.'s Counter 56.1 ¶ 64.)  At 12:51 P.M., Hall responded to Kaplan, copying Weisenberger, and stated that she was "looping in [Weisenberger] [who] also just found out [Plaintiff] is looking to go on leave" and noted that "[Plaintiff] also spoke to [Ramclam] and [Weisenberger] is getting the info . . . since we already planning to layoff this employee due to not needing the role."  (Ex 10 at 4 (omission

in original); Pl.'s Counter 56.1 ¶ 65.)

### iii.   April 15, 2021

The following morning, April 15, 2021 at 9:50 A.M., Weisenberger emailed Ramclam

that the situation was "taking on life of its own" and that she needed for Ramclam to send her

"all the notes" she has on Plaintiff as "[l]egal is going to review to see if we can let go now or

have to wait till after leave if she applies for one."  (Ex 11 at 3; Pl.'s Counter 56.1 ¶ 66.)  Her

email directed Ramclam to call her so that she can fill in the details.  (Pl.'s Counter 56.1 ¶ 66; Ex

11 at 3.)  That afternoon, Plaintiff left Ramclam a voicemail around 2:00 P.M. that she had called

HR, who informed her that FMLA "only kicks in if it is a week that [she is] absent," that

"therefore, for this week" Ramclam would "have to use [her] sick time or whatever [Ramclam

thought] is appropriate," and that she "ha[s] to be out one full week before submitting that form."

(*See* Ex. EE at 2; Ramclam Tr. 179:17–180:11; Defs.' 56.1 ¶ 62.)  That evening, Kaplan emailed

Hall and Weisenberger asking "[w]ere we able to finalize things related to [Plaintiff] today?"

(Pl.'s Counter 56.1 ¶ 67; Ex 10 at 11.)

### e.   Actions by Plaintiff and Defendants from April 16, 2021 until April 23, 2021

Plaintiff remained out of work for medical care and treatment through April 23, 2021,

and continued texting Ramclam updates, and Ramclam in turn shared with Palazzotto, Kaplan,

Weisenberger, and others the various text messages and voicemails received from Plaintiff.

(Defs.' 56.1 ¶¶ 63–65; Pl.'s Counter 56.1 ¶¶ 35, 41–42.)  On Wednesday, April 21, 2021,

Plaintiff informed Ramclam that she would be out of work the following two days and that "[i]f

things go well I am hoping for Monday."  (Ex. 12 at 3; Defs.' 56.1 ¶ 65.)  Ramclam emailed a

screenshot of the text to Weisenberger, Kimura, Addeo, Palazzotto, and Kaplan marked with

high priority, writing "Below is the message I just received from [Plaintiff] indicating that she

hopes to be in on Monday" and asked them to advise.  (Ex. 12 at 2–3.)  Two minutes later,

Addeo, writes separately to Kaplan, "I know you said that [Plaintiff] is not to return to the office but that's on HR to handle correct?" (*Id.* at 2; Pl.'s Counter 56.1 ¶ 69.)  Kaplan forwarded Addeo's email to Hall, copying Weisenberger, writing that it "seems [Plaintiff] wants to return to the office on Monday.  We thought she was going on FMLA, but doesn't seem to be the case.  Assume this changes our termination/layoff stance?  Please let me know your thoughts."  (Ex. 12 at 2; Pl.'s Counter 56.1 ¶ 70.)

On April 21, 2021, Derek Forte from NYULH Employee Relations emailed Kimura and asked, "[d]id they decide to not discipline her for sleeping on the job?" (Pl.'s Counter 56.1 ¶ 71; Defs.' 56.1 ¶ 51.)  Kimura responded to Forte's email and copied Weisenberger and Rodriguez, writing "[t]hey were waiting for her to report to work to issue the discipline for sleeping while on duty.  She hasn't reported to work since the incident." (Pl.'s Counter 56.1 ¶ 72.)

On April 22, 2021, at 3:56 P.M., Kimura emailed Ramclam, copying Weisenberger, Palazzotto, Kaplan, and others that Plaintiff would need to provide Ramclam with a doctor's note indicating the date that she is cleared to return to work, and that when Plaintiff returns, Ramclam should "issue a written warning as she was discovered sleeping while on duty."  (Ex. 14 at 3; Pl.'s Counter 56.1 ¶ 73; Defs.' 56.1 ¶ 68.)  On April 22, 2021, Ramclam received notification that Plaintiff had requested FMLA leave for April 13, 2021 through April 23, 2021.  (Ex. NN at 2; *see* Pl.'s Counter 56.1 ¶ 40.)  Plaintiff then called Ramclam to notify her that she could return to work on April 26, 2021.  (Ex. MM at 2–3; Ex. 14 at 2–3.)  Shortly after the call, Ramclam emailed Kimura, copying Weisenberger, Palazzotto, Kaplan, and others, Plaintiff's scheduled return date, that she had advised Plaintiff of the need for a doctor's note to return, that Plaintiff told her that she had applied for FMLA, and Ramclam had received acknowledgment of the FMLA request.  (Pl.'s Counter 56.1 ¶ 74; Ex. MM at 2; Ex. 14 at 2.)

### f.   Plaintiff's termination

On April 23, 2021, Kaplan, Weisenberger, and Hall met with Forte.  (Pl.'s Counter 56.1 ¶ 84; Defs.' 56.1 ¶ 69.)  This meeting was "the very first time, Defendants got Forte involved in the decision-making process." (Pl.'s Counter 56.1 ¶ 80.)  They asked Forte how NYULH had handled prior incidents of other employees sleeping on the job and Forte informed them that the employees had been terminated.  (Pl.'s Counter 56.1 ¶¶ 80–81; Defs.' 56.1 ¶ 69.)  This meeting resulted in a decision to terminate Plaintiff for sleeping while on duty.  (Pl.'s Counter 56.1 ¶ 84.)  Palazzotto received an email indicating that the termination date was April 23, 2021.  (Ex. 27 at 2.)  Kaplan emailed Swirnow, copying Hall, writing "Just wanted to update you that after a number of conversations with HR the decision was made today to proceed with the termination of [Plaintiff].  This is slated to occur on Monday next week."  (Ex. 10 at 13; Pl.'s Counter 56.1 ¶ 85.)  Between April 23 and 26, 2021, Weisenberger led her team and Ramclam in drafting and circulating four versions of a termination letter as they decided the details to include in explaining the termination.[10]  (Defs.' 56.1 ¶ 73; Pl.'s Counter 56.1 ¶ 92.)

---

[10]   One version of the termination letter stated that Plaintiff's employment "[was] terminated effective April 23, 2021 due to the incident on April 12, 2021 where [she was] found sleeping on the exam table" and provides no other detail on the incident.  (Ex. 17 at 8.)  A second version states that "[o]n April 23, 2021, [Plaintiff was] found sleeping on the exam table in violation of [NYULH's] Policy," "[o]n April 15, 2020, [Plaintiff was] issued a Final Written Warning for being no call/no show," and "[d]espite the Final Written Warning, [her] attendance record has not improved to an acceptable level."  (*Id.* at 12, 25.)  A third version makes no mention of Plaintiff's attendance record and details the April 12, 2021 incident, noting that on that date, a Carle Place employee "was calling [Plaintiff] in an effort to transfer a call from a patient," Plaintiff's "lack of response prompted this employee to look for [Plaintiff] in the practice," Plaintiff was "then discovered sleeping on the exam table during work hours," Plaintiff's "demeanor was dismissive and apologetic" when "questioned regarding this incident," and "[t]his behavior goes against the organization's conduct of employees and sleeping while on duty policy."  (*Id.* at 13, 27.)  A fourth version states that Plaintiff was "being terminated from employment for behavior that does not align with our organizational standards" and indicates that she was "found sleeping on an exam table during work hours . . . in direct violation of [NYULH's] Employee Code of Conduct policy."  (*Id.* at 26.)

On April 26, 2021, Ramclam called Plaintiff to inform her of Defendants' decision to terminate her employment and read to Plaintiff the contents of the termination letter.[11]  (Defs.' 56.1 ¶¶ 76–77; Pl.'s Counter 56.1 ¶ 102.)  Plaintiff's FLMA leave for April 13, 2021 through April 26, 2021 was approved on May 6, 2021.[12]  (Ex. OO at 2.)

## II.    Discussion

### a.    Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir. 2025) (quoting Fed. R. Civ. P. 56(a)); *see Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (same) (quoting Fed. R. Civ. P. 56(a)).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*,

---

[11]    The final termination letter, dated April 26, 2021 and signed by Ramclam, discussed the events of April 12, 2021, including that Plaintiff was found "sleeping on the exam table during work," that Defendants "questioned" Plaintiff regarding the incident, and that Plaintiff "stated that [she] had [her] eyes closed because [she] had a headache."  (Ex RR at 2.)  The letter noted that Plaintiff "did not notify [her] manager that [she was] taking a break" and explained that "[t]his behavior goes against the organization's conduct of employees policy.  As a result, and after careful review and consideration, [Plaintiff was] being terminated from employment with NYU Langone–Long Island in [her] position as Physician Assistant — FGP, effective immediately."  (*Id.*)

[12]    Plaintiff disputes the date her FMLA leave request was approved, relying on Hall's deposition testimony, including her answering "yes" to the question "[w]as [Plaintiff] approved for Family Medical Leave after the incident at work where she was allegedly sleeping and prior to her termination?"  (Pl.'s 56.1 Resp. ¶ 70; Hall Tr. 41:18–24.)  The FMLA approval letter unequivocally shows that Plaintiffs' FMLA leave request was approved on May 6, 2021, after her termination, (*see* Ex. OO), and Plaintiff provides no support for Hall's testimony that Plaintiff's leave request was approved before her termination.

36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003));

see also *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) ("In determining

whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw

all inferences against the moving party." (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d

120, 126 (2d Cir. 2013))).  The role of the court "is not to resolve disputed questions of fact but

only to determine whether, as to any material issue, a genuine factual dispute exists."  *Lara-*

*Grimaldi v. County of Putnam*, 132 F.4th 614, 633 (2d Cir. 2025) (quoting *Porter v. Dartmouth-*

*Hitchcock*, 92 F.4th 129, 147 (2d Cir. 2024)); *see Kee v. City of New York*, 12 F.4th 150, 167 (2d

Cir. 2021) (same) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A

genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably

find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.

*Id.*; *Solid 21, Inc. v. Breitling U.S.A., Inc.*, 96 F.4th 265, 276 (2d Cir. 2024) ("The mere existence

of a scintilla of evidence in support of the non-movant's position will be insufficient; there must

be evidence on which the trier of fact could reasonably find for the non-movant." (quoting *Sports*

*Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996))).  The court's function is to

decide whether, "after resolving all ambiguities and drawing all inferences in favor of the

nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State*

*Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477

U.S. at 248; and then citing *Garcia*, 706 F.3d at 127, 129); *see also Capitol Recs.*, 125 F.4th at

418 ("[A] genuine dispute as to a material fact precludes summary judgment 'where the evidence

is such that a reasonable jury could decide in the non-movant's favor.'" (quoting *Lucente v.*

*County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020))).

    In cases that involve claims of discrimination, courts must use "an extra measure of

caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare" and "the court must scrutinize affidavits and depositions carefully for circumstantial evidence that, if credited by the factfinder, could reasonably be interpreted as showing discrimination." *Moll v. Telesector Res. Grp.*, 94 F.4th 218, 228 (2d Cir. 2024) (first quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167, 169 (2009), and then citing *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006("[A]n extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." (quoting *Holtz*, 258 F.3d at 69)).  However, "the salutary purposes of summary judgment [—] avoiding protracted and harassing trials [—] apply no less to discrimination cases than to . . . other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)).  Striking this balance requires that "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz*, 258 F.3d at 69 (first quoting *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997), and then citing *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).  "Because the district court is not to resolve issues of fact on a summary judgment motion, 'its determination of whether the circumstances give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Abdelal v. Police Comm'r*, 857 F. App'x 30, 31

(2d Cir. 2021) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).

> **b.  Plaintiff's ADA discrimination claim**

Plaintiff brings a claim for disability discrimination under the ADA, alleging that Defendants discriminated against her on the basis of her disability by terminating her employment.  (See Compl. ¶¶ 50–64.)

The ADA "makes it unlawful for a covered employer to 'discriminate against a qualified individual on the basis of disability.'"  *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2063 (2025) (quoting 42 U.S.C. § 12112); *Yerdon v. Poitras*, 120 F.4th 1150, 1156 (2d Cir. 2024) (explaining that the ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability" (alteration in original) (quoting 42 U.S.C. § 12112)); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 179 (2012) ("The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability.").  Discrimination claims brought under the ADA "are subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Parker v. Israel Disc. Bank of N.Y., Inc.*, No. 24-688, 2025 WL 1779219, at *1 (2d Cir. June 27, 2025) (citing *McMillian v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)); *Forrester v. Prison Health Servs., Inc.*, 651 F. App'x 27, 28 (2d Cir. 2016) (first citing *McMillian*, 711 F.3d at 125; then citing *Cortez v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015)); *see also Bey v. City of New York*, 999 F.3d 157, 165 (2d Cir. 2021).  There are three steps to this burden-shifting analysis: (1) "[a] plaintiff must establish a prima facie case"; (2) "the employer must offer through the introduction of admissible evidence, a legitimate non-discriminatory reason for the discharge"; and (3) "the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Blanton v. Educ. Affiliates, Inc.*, No. 21-1221, 2022 WL 1505124, at *2 (2d Cir. May 12, 2022); *see Porter v. Dartmouth-Hitchcock Med. Ctr.*,

92 F.4th 129, 145–46 (2d Cir. 2024) (explaining the burden-shifting framework (citing *McDonnell Douglas*, 411 U.S. at 802–07)); *see also Parker*, 2025 WL 1779219, at *1 (same); *Genova v. County of Nassau*, 851 F. App'x 241, 242 (2d Cir. 2021) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)) (same).

### i.    Plaintiff has made a prima facie case for discrimination

Defendants "[a]ssum[e] *arguendo* that Plaintiff can establish the first three prongs of her prima facie burden," but contend that "she still cannot demonstrate that her termination was based on her disability" and therefore fails to meet her prima facie burden.  (Defs.' Mem. 2, 9.) Defendants argue that Plaintiff relies on facts that "are either not genuinely disputed material[] facts or are irrelevant, duplicative, or information previously submitted in Defendants' moving papers" and "fail to demonstrate inconsistencies and/or factual disputes that are relevant or material to this summary judgment motion."  (Defs.' Reply 2.)  They also argue that "Plaintiff's argument based on the temporal proximity of Plaintiff's 'medical episode' and her termination is an attempt to distract from her policy violation and the documented deliberative decision-making process that led to her termination," as evidenced by "[v]arious emails between Defendants' [HR] representatives and the business leadership decision-maker, Kaplan" that "detail the ongoing discussions about the options for disciplining Plaintiff for her policy violation."  (*Id.* at 2–3, 7.)

Plaintiff argues that the "sole element of Plaintiff's *prima facie* case that is in dispute is whether her termination was because of her disability (*i.e.*, causation)" and that the record supports an inference of discriminatory intent that is sufficient to meet her "*de minimis* burden" for causation.  (Pl.'s Opp'n 5.)  In support, Plaintiff relies on (1) Defendants' awareness of her disability; (2) that she suffered a medical emergency on April 12, 2021 that "was a result of her disability"; (3) the "close temporal proximity between her termination and . . . medical episode, along with [her] medical treatment and . . . recent clearance to return to work"; and (4) email

communications in the two days following her April 12, 2021 medical episode, "one between Weisenberger and her HR subordinates and the other between Weisenberger and senior level staff"[13] that she argues are a basis for a "jury . . . to find that Weisenberger gave directives to her subordinates . . . with which she had no intentions of following through" in order "to make it appear as though Defendants were acting in a nondiscriminatory fashion" while she "collud[ed] with higher ups to "manage…out" Plaintiff and "demonstrate conflicting motives and call into question Defendants' true intent"; and (5) "inconsistent narratives surrounding the events of April 12, 2021"[14] that "at the very least, call into question Defendants' motive" and make it "not a far leap to infer that Defendants terminated Plaintiff for an impermissible, discriminatory reason." (*Id.* at 6–10.)

"To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was

---

[13] Plaintiff contends that in the first email, dated April 13, 2021, Kimura emailed Weisenberger, Ramclam, Palazzo, and HR staff that she spoke with Weisenberger and the two "both agree[d] that the incident requires written warning." (Pl.'s Opp'n 8.) In the second email, sent the following day on April 14, 2021, Plaintiff contends Weinberger emailed Kaplan and Hall describing her plan to "manage [Plaintiff] out" and that she sent this email "despite" knowing how ill Plaintiff had become" and "representing to Kimura, Rodriguez, Palazzotto, and Ramclam that the appropriate response to Plaintiff's alleged misconduct was to issue a written warning." (*Id.*) *See also supra* Section I.d.i-ii (summarizing correspondence from April 13 and 14, 2021).

[14] Plaintiff contends that emails from April 13 and 14, 2021 "conflict with the events as they actually happened" as Gionesi, "the sole witness of Plaintiff's alleged misconduct, witnessed and relayed to Ramclam." (Pl.'s Opp'n 9.) Plaintiff argues that "Gionesi testified that before she found Plaintiff laying down in the exam room . . .  she did not try to call or page Plaintiff in the room, as there was no paging system in the office" and "that the door to the exam room was ajar, and, upon finding her laying down in the exam room, called out her name from the door, and did not walk up to her" while emails from Kimura's and Weisenberger's emails on April 13, 2021 and April 14, 2021 "tell a completely different narrative," specifically "that there was a call or page to Plaintiff's office, and that Gionesi found Plaintiff asleep and walked up to her." (*Id.* at 9–10.)

disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (citing *Sista*, 445 F.3d at 169); *see Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-1220, 2024 WL 3264125, at *1 (2d Cir. July 2, 2024) (similar); *Gorbea v. Verizon N.Y. Inc.*, No. 20-3486, 2021 WL 4851389, at *2 (2d Cir. Oct. 19, 2021) (listing the four requirements for a prima facie ADA case (quoting *Woolf*, 949 F.3d at 93)); *Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 643 (2d Cir. 2021) (same); *Kinneary v. City of New York*, 601 F.3d 151, 155–56 (2d Cir. 2010) (quoting *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005)) (same); *Donkor v. Weill Cornell Med. Coll.*, No. 23-CV-369, 2025 WL 639313, at *3 (S.D.N.Y. Feb. 27, 2025) (same); *see also Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 48–49 (2d Cir. 2014) (outlining requirements for prima facie case under the ADA (quoting *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013))); *Knope v. Garland*, No. 20-CV-3274, 2021 WL 5183536, at *2 (2d Cir. Nov. 9, 2021) (outlining requirements for a prima facie case under the ADA).  A plaintiff's burden at this stage is "minimal." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023); *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("[A] plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de minimis.'" (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005))); *see also Trivedi v. St. Peter's Health Partners Med. Assocs., P.C.*, No. 23-7608, 2024 WL 5087524, at *1 (2d Cir. Dec. 12, 2024) (explaining same); *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)) (same).  "With respect to the causation requirement, the plaintiff must demonstrate that 'but for' his disability or perceived disability, his employment would not have been terminated." *Daly*, 2024 WL 3264125 at *1 (quoting *Natofsky v. City of New York*, 921 F.3d 337, 347 (2d Cir. 2019)); *see*

*Porter*, 92 F.4th at 148 (quoting *Natofsky*, 921 F.3d at 349); *see also Militello v. Visiting Nurse Ass'n Health Care Servs., Inc.*, No. 22-CV-7759, 2025 WL 964019, at *4 (E.D.N.Y. Mar. 31, 2025) ("Plaintiff faces a low bar to make a *prima facie* case of the elements, but still "must establish but-for causation." (citations omitted)); *Morrison v. Millenium Hotels*, No. 18-CV-6811, 2021 WL 1534293, at *4 (S.D.N.Y. Apr. 19, 2021) ("[T]o survive summary judgment, [plaintiff] must show that a jury could reasonably conclude that [the defendant] would not have [terminated his employment] if he . . . did not have a disability."). "'[B]ut-for' causation does not require proof that [discrimination] was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the [discriminatory] motive." *Villetti v. Guidepoint Glob. LLC*, No. 21-2059, 2022 WL 2525662, at *5 (2d Cir. July 7, 2022) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015)); *see Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (same); *Carter v. TD Bank, N.A.*, No. 23-950, 2024 WL 2828470, at *4 (2d Cir. June 4, 2024) ("The plaintiff need not prove that discrimination was the employer's sole motivation, but discrimination must be a 'but-for cause' of the adverse employment action." (citing *Natofsky*, 921 F.3d at 348)).

Plaintiff has met her de minimis burden for establishing a prima facie case of discrimination. Defendants do not challenge that (1) Defendants are employers "subject to the ADA," (2) Plaintiff was "disabled within the meaning of the ADA" due to her medical conditions, and (3) Plaintiff was "otherwise qualified to perform the essential functions" of her position as a physician's assistant "with or without reasonable accommodation." *Woolf*, 949 F.3d at 93. As to the fourth prong, Plaintiff has provided sufficient evidence from which a reasonable factfinder could infer that Plaintiff was terminated because of her medical disability. First, Defendants fired Plaintiff for sleeping or appearing to sleep while on duty and the undisputed conduct that gave rise to her termination — Plaintiff laying on an examination room

table with her eyes closed, lights turned off, and door slightly ajar during work hours — was directly caused by symptoms of her medical conditions. *See Vives v. N.Y.C. Dep't of Corrections*, No. 15-CV-6127, 2019 WL 1386738, at *11 (E.D.N.Y. Mar. 27, 2019) (finding inference of discrimination where plaintiff "was terminated because of her absence and she was absent because of her medical condition").

Second, the record supports that Kaplan, Weisenberger, and Hall, decisionmakers involved in deciding to terminate Plaintiff, were made aware that Plaintiff's medical condition caused the incident through email reports in the days following the incident. Moreover, in the time between Kaplan's directive and the date Defendants made the official decision to terminate on April 23, 2021, Plaintiff remained out of work and Ramclam shared the text messages and voicemails that Plaintiff provided with updates on medical care and treatment with Kaplan and Weisenberger. (Pl.'s Resp. to Defs.' 56.1 ¶¶ 63–65; Pl.'s Counter 56.1 ¶ 35, 41–42.) *See supra* Section I.e.; *Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*, No. 17-CV-7895, 2020 WL 5209779, at *6–*10 (S.D.N.Y. Sept. 1, 2020) (finding the plaintiff satisfied elements of the prima facie case at summary judgment where he presented sufficient evidence from which a jury could infer that the sole decisionmaker who recommended his termination for violating the "employee handbook regarding theft of company time" knew he had a disability), *aff'd*, No. 20-3092, 2021 WL 4851384 (2d Cir. Oct. 19, 2021); *MacDuff v. Simon Mgt. Assocs. II, LLC.*, No. 20-CV-773, 2022 WL 972426, at *5–8 (D. Conn. Mar. 31, 2022) (finding employee established prima facie case for unlawful termination under the ADA where it was undisputed that the HR director who "approved the decision to terminate [the] plaintiff's employment" had "knowledge of [the] plaintiff's disability and request for accommodation"); *cf. Pacenza v. IBM Corp.*, 363 F. App'x 128, 130–31 (2d Cir. 2010) (affirming that the plaintiff "failed to make a prima facie showing of discrimination under the

23

ADA" where he "did not adduce evidence that his supervisor had knowledge of his disability" (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003))).

Third, it is undisputed that Defendants made the decision to terminate Plaintiff on April 23, 2021, (Pl.'s Counter 56.1 ¶ 83), eleven days after the April 12, 2021 incident that gave rise to her termination and the day after she gave notice that she could return to work, (Ex. 14 at 2–3). Discussions regarding her termination overlapped with her leave for the medical condition that led to the conduct for which she was terminated and Defendants notified Plaintiff of her termination on April 26, 2021, the day she was to resume working. *See supra* Sections I.d–f. At the prima facie stage, the temporal proximity of these events supports an inference of discrimination sufficient to establish causation. *See Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*, No. 20-3092, 2021 WL 4851384, at *2 (2d Cir. Oct. 19, 2021) (stating that "[t]he temporal proximity of events may give rise to an inference of [discrimination] for the purposes of establishing a prima facie case of [discrimination] under [the ADA]" (alterations in original) (quoting *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010), *abrogation in part on other grounds recognized in Hale v. Vidal*, No. 22-2973, 2023 WL 7211909, at *1 (2d Cir. Nov. 2, 2023))); *Stryker v. HSBC Sec. (USA)*, No. 16-CV-9424, 2020 WL 5127461, at *9 (S.D.N.Y. Aug. 31, 2020) (finding that the "closeness in time between the [employee's] return from his second leave of absence" and the immediate start of the "alleged adverse actions against him raise[d] an inference of discrimination sufficient to satisfy" causation on summary judgment); *see also Acosta v. Kennedy Child.'s Ctr.*, No. 24-CV-3358, 2025 WL 70141, at *6 (S.D.N.Y. Jan. 10, 2025) (holding that the one week between the plaintiff's disclosure of her condition and request for accommodation and termination supported the inference that the plaintiff was terminated based on her disability (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015))).

As Plaintiff has made a prima facie case of discrimination, the burden shifts to Defendants to proffer a legitimate, nondiscriminatory reason for terminating her employment.

### ii.    Defendants have proffered a non-discriminatory reason for Plaintiff's termination

Defendants argue that Plaintiff "being asleep (or appearing to be asleep) while on duty on April 12, 2021" in violation of their policies "establish[es a] non-discriminatory basis for Plaintiff's termination" and they "have proffered ample evidence through deposition testimony and contemporaneous documentation" and by showing "the progression of discussions within the HR department and the internal evaluation process." (Defs.' Mem. 9, 16.) They argue that the "decision to terminate Plaintiff's employment because of the referenced violation is consistent with [Defendants'] prior history and internal precedent of ending the employment of workers who were found to be sleeping, or appearing to be sleeping, during their designated work hours," demonstrating "that [their] policies were enforced consistently and without discriminatory intent." (*Id.* at 9–10.) Defendants contend that Plaintiff "sleeping (or appearing to be asleep) on a patient examination table with the lights off without notifying anyone or asking for an accommodation in advance were not an anomaly, given her prior history of reporting late and failing to provide advance notice to [Defendants] about her symptoms or anticipated tardiness." (*Id.* at 9.)

Plaintiff argues that Defendants "purported legitimate, non-discriminatory reason" is "unavailing" because "a termination of Plaintiff's employment based on the alleged policy violation" is a "termination based on Plaintiff's disability" as "had she not had an explosive migraine on April 12, 2021, she would not have needed to take her medication, turn off the lights, and lay down and, consequentially, would not have been found by Defendants to have 'violated' company policy." (Pl.'s Opp'n 10–11.) Plaintiff contends that Defendants failed to produce admissible evidence that (1) Plaintiff was actually sleeping on the job and thus violated

company policy; (2) Defendants "truly believed" she was sleeping on the job and "thus were motivated by the policy violation in their decision"; and (3) they "have enforced this policy in the past." (*Id.* at 10, 14.)

An "'employer's explanation of its reasons must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.'" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (quoting *Meiri*, 759 F.2d at 996–97), *superseded in part on other grounds by* Fed. R. Civ. P. 37(e); *Claud v. Brown Harris Stevens of Hamptons, LLC*, 676 F. Supp. 3d 100, 129 (E.D.N.Y. 2023) ("The employer bears the burden of production at this stage to 'rebut the inference of discrimination that arises from proof of the prima facie case' and to 'frame[] the factual issue with sufficient clarity to afford the employee a full and fair opportunity to demonstrate pretext.' 'To this end, the employer's explanation of its reasons must be clear and specific.'" (alteration in original) (quoting *Meiri*, 759 F.2d at 996–97). "[I]f the employer adduces such evidence, the plaintiff, in order to avoid summary judgment, must point to evidence sufficient to permit an inference that the employer's proffered reason is pretext for the alleged prohibited discrimination." *Porter*, 92 F.4th at 146 (citation omitted)); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (per curiam) ("If the defendant proffers such a reason, the presumption of discrimination . . . drops out of the analysis, and the defendant will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." (quoting *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005))). The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Supp. Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012); *Anglin v. Hunter*, No. 19-CV-219, 2025 WL 968046, at *14 (D. Vt. Mar. 31, 2025) (same). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*,

509 U.S. at 509); *Gopal v. Univ. of Conn.*, No. 19-CV-1810, 2025 WL 969557, at *13 (D. Conn. Mar. 31, 2025) (same); *O'Neill v. Newburgh Enlarged City Sch. Dist.*, No. 22-CV-5017, 2024 WL 3185966, at *14 (S.D.N.Y. June 26, 2024) ("[T]he [defendant] need not *prove* at this stage that its legitimate, non-discriminatory reason for firing [the p]laintiff was accurate or correct — it is sufficient to merely articulate such a reason." (citing *Hicks*, 509 U.S. at 509)), *aff'd*, No. 24-2007, 2025 WL 1554748 (2d Cir. June 2, 2025); *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 132 (E.D.N.Y. 2023) ("Indeed, a court should not second-guess an employer's proffered explanation so long as it is not unlawfully discriminatory." (citing *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 156 (E.D.N.Y. 2013), *aff'd*, 576 F. App'x 39 (2d Cir. 2014))), *appeal withdrawn sub nom. Turner v. Delta Air Lines, Inc.*, No. 23-451, 2023 WL 4311227 (2d Cir. June 14, 2023).

Defendant has proffered a legitimate, nondiscriminatory reason for Plaintiff's termination — Plaintiff was found sleeping or appearing to sleep while on duty in violation of the Workplace Conduct Policy. (Defs.' Mem. 9–10.) The Workplace Conduct Policy prohibits "[s]leeping, or the appearance thereof, while on duty" (Defs.' 56.1 Resp. ¶ 10; Ex. E at 2–3), and the record demonstrates that Plaintiff was reported for conduct on April 12, 2021 that violated the policy. Specifically, Gionesi found Plaintiff laying down in her temporary office with the lights off, (Pl.'s Counter 56.1 ¶¶ 23–24; Defs.' 56.1 ¶ 41); Plaintiff had her eyes closed and was on duty at the time, (*see* Pl.'s Counter 56.1 ¶¶ 16–20; Ricciardo Tr. 139:10–23); Gionesi relayed what she saw to Ramclam, (Pl.'s Counter 56.1 ¶ 29; Defs.' 56.1 Resp. ¶ 43); and Ramclam reported the incident to her own supervisor and HR representatives, (Pl.'s Counter 56.1 ¶ 44; Defs.' 56.1 ¶ 48; Ex. V at 2). Under the Workplace Conduct Policy, Defendants have discretion in determining the "appropriate" disciplinary action including termination. (Ex. E at 2–3; Defs.' 56.1 ¶ 10.) Consistent with this policy, after Ramclam reported the incident, discussions among

Weisenberger, Kaplan, Swirnow, and others ensued regarding disciplinary action, culminating in the April 23, 2021 meeting where Kaplan, Weisenberger, and Hall decided, after consulting with Forte, that they would terminate Plaintiff. *See supra* Section ii.d–f.

Plaintiff's argument that Defendants have failed to proffer a legitimate, nondiscriminatory reason because the alleged Workplace Conduct Policy violation is a "termination . . . based on [Plaintiff's] disability," (Pl.'s Opp'n 10), is misguided. As the Second Circuit has explained, "[t]he ADA does not excuse workplace misconduct because the misconduct is related to a disability." *Russell v. Westchester Cmty. Coll.*, No. 23-7572, 2025 WL 1165846, at *2 (2d Cir. Apr. 22, 2025) (quoting *McElwee v. County of Orange*, 700 F.3d 635, 641 n.4 (2d Cir. 2012)); *Handler v. Dutchess Cnty. Cmty. Coll.*, No. 21-CV-2637, 2024 WL 343091, at *5 (S.D.N.Y. Jan. 30, 2024) (same), *appeal withdrawn*, No. 24-412, 2024 WL 3867620 (2d Cir. June 3, 2024); *see Johnson v. L'Oreal USA*, No. 21-2914, 2023 WL 2637456, at *5 (2d Cir. Mar. 27, 2023) ("'[U]nder the ADA,' . . . 'workplace misconduct' — a category which includes credible complaints about one's work performance — 'is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability.'" (alteration in original) (quoting *McElwee*, 700 F.3d at 641)); *see also BaRoss ex rel. BaRoss v. Greenlawn Volunteer Fire Dep't, Inc.*, No. 16-CV-4805, 2021 WL 930254, at *5 (E.D.N.Y. Mar. 10, 2021) (concluding that the fire department did not violate the ADA in discipling volunteer firefighter for misconduct that violated its bylaws but resulted from the firefighter's Alzheimer's disease because "it [was] immaterial that [p]laintiff's misconduct related to his disability"). Courts routinely find that sleeping on the job is a legitimate, nondiscriminatory reason to terminate an employee even when the plaintiff is disabled or otherwise a member of a protected class. *See, e.g., Cruz v. N.Y.C. Transit Auth.*, No. 23-CV-5272, 2025 WL 551809, at *13–14 (S.D.N.Y. Feb. 19, 2025) (concluding that employer that fired former administrative manager for "sleeping on

duty" in violation of agency rules had articulated a legitimate, nondiscriminatory reason despite knowing the manager struggled to sleep at night due to known disabilities); *Beaton v. Metro. Transp. Auth. N.Y.C. Transit*, No. 15-CV-8056, 2016 WL 3387301, at *2 (S.D.N.Y. June 15, 2016) (finding employer's firing of a subway station agent for sleeping while on duty was a legitimate, nondiscriminatory reason even though the agent claimed he was wrongfully accused and only appeared to be sleeping on account of drowsiness from his schizophrenia medication); *see also Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 WL 5036970, at *5–6 (S.D.N.Y. Aug. 26, 2015) (holding employer's termination of pregnant receptionist for falling asleep on a couch in the reception area during business hours was a legitimate, nondiscriminatory reason).

Plaintiff's remaining arguments misconstrue Defendants' burden at this stage of the *McDonnell Douglas* framework, and in effect seek to impose a higher burden on Defendants. Contrary to Plaintiff's argument, Defendants need not prove that Plaintiff was actually sleeping on the job, that they truly believed she was sleeping on the job, or that they have enforced this policy through termination in the past because the issue is not whether Defendants' proffered reason is "accurate or correct." *O'Neill*, 2024 WL 3185966, at *14; *see Gopal*, 2025 WL 969557, at *13 (explaining Defendants' burden "is one of production, not persuasion; it can involve no credibility assessment" (quoting *Reeves*, 530 U.S. at 142)); *Hicks*, 509 U.S. at 509 ("[T]he burden-of-production determination necessarily *precedes* the credibility-assessment stage."). Defendants have proffered that they terminated Plaintiff for violating their Workplace Conduct Policy and articulated "clear and specific" reasons for doing so. *Byrnie*, 243 F.3d 93. This is sufficient to meet their burden.

### iii.   Plaintiff has failed to demonstrate pretext

Defendants argue "there is no pretext" because they have discretion to terminate employees "found to be sleeping or resting during their designated work hours" and terminating

Plaintiff "is consistent with its prior history and internal precedent" and "demonstrates that [Defendants'] policies were enforced consistently and without discriminatory intent."  (Defs. Mem. 9–10, 13–14.)  In support, Defendants argue: (1) they included "Plaintiff's work history" in their 56.1 Statement to "provide[] a comprehensive context for the communications among [HR] and Ambulatory Practice leaders which led to her termination," (Defs.' Reply 7), and "the sequence of events surrounding the decision-making process within the HR department" suggest "a thorough evaluation rather than a predetermined decision to terminate Plaintiff," (Defs.' Mem. 15–16)";[15] (2) Plaintiff's reduced work schedule accommodation "does not . . . permit Plaintiff to violate [Defendants'] policies" and the facts support that she violated company policy and her termination "was completely independent of [her] alleged disability status."  (Defs.' Reply 8–9; Defs.' Mem. 8); (3) the differences between the four drafts of the termination letters "are immaterial" and insufficient "to support or infer pretext" because they "show that [Defendants] did not attempt to doctor or manipulate any facts" concerning the April 12, 2021 incident, (Defs.' Mem. 14–15); (4) Weisenberger's emails concerning the April 12, 2021 incident are admissible because "Plaintiff had ample opportunity to depose everyone involved in those email communications," "Weisenberger was merely the messenger who relayed the incident as reported by Plaintiff's direct manager [Ramclam], who was deposed," and Kaplan authenticated the emails during his deposition, (Defs.' Reply 5–6; Defs.' 56.1 Reply ¶¶ 51–55); and (5) Plaintiff "ignores" that Hall's testimony about Forte's statement is admissible under the "hearsay exception for statements that express a declarant's state of mind at the time," (Defs.' Reply 3

---

[15]  Defendants also argue that Plaintiff's argument that "Defendants included numerous instances of her policy violations in their [56.1 Counterstatement] as a way to distract the Court" is "truly the pot calling the kettle black" because Plaintiff's response to Defendants' 56.1 Statement "is an unavailing attempt to cloud the summary judgment record when in fact it is clear as to the material facts."  (Defs.' Reply 2.)

(citing Fed. R. Evid. 803(3)).

Plaintiff argues that Defendants' proffered reason for her termination is pretextual because (1) Defendants have offered "inconsistent" and "varying" explanations for her termination during this litigation[16] and the "bulk" of Defendants' 56.1 Statement is "completely irrelevant" and "immaterial" facts concerning Plaintiff's attendance and tardiness violations, on-going issues with coworkers, and challenges to Plaintiff's judgment" that Defendants included "to paint Plaintiff as troublesome employee who deserved to be discharged regardless of Defendants' true motive, and to divert the court's attention away from [their] discriminatory motive"; (Pl.'s Opp'n 14–16); (2) Defendants' proffered reason is implausible as whether Plaintiff was actually sleeping is a disputed fact and emails, deposition testimony, and four draft termination letters make "clear" that Defendants stalled firing Plaintiff for ten days to "craft an alleged non-discriminatory reason for Plaintiff's termination to avoid liability" as they "knew terminating Plaintiff's employment after she suffered a medical event due to her disability was problematic" and that "she had suffered a medical event at work, was undergoing medical treatment, and was seeking FMLA leave," (*id.* at 17–18); and (3) Defendants have not produced admissible evidence as to the information that Forte provided  about "what Defendants had done in the past when an employee . . . was found sleeping on the job" and "Weisenberger's email correspondences, conversations, and communications," making these statements inadmissible

---

[16]  In support, Plaintiff contends Defendants (1) stated in their interrogatory responses that Plaintiff was terminated for "failure to comply with Defendants' attendance policies and procedures on numerous occasions despite being counseled on the same and for her actions on April 12, 2021," (2) asserted during depositions that she was terminated for "sleeping on the exam table during working hours," and (3) argued in their moving papers that she was "sleeping or laying in rest with her eyes closed, with the lights out on a patient examination table during her shift, without providing any notice to her manager that she was purportedly unable to work. (Pl.'s Opp'n 15.)

hearsay that Defendants cannot rely on to support their proffered reason for terminating Plaintiff and creating a genuine dispute of material fact as to pretext.  (*Id.* at 2, 11–13.).

In support of her argument that Defendants have not produced admissible evidence concerning the information Forte provided, Plaintiff contends that she relies on "Hall's testimony regarding Forte's investigation" into "what Defendants had done in the past when an employee . . . was found sleeping on the job" and that Defendants provide no sworn testimony from Forte. (*Id.* at 12.)  Plaintiff contends the lack of admissible evidence as to Forte makes it "impossible to determine whether Defendants' supposed policy of firing employees who have been found sleeping on the job has been applied consistently and without discriminatory intent, if at all" and that testimony from Palazzotto, Addeo, and Ramclam indicating that they did not know of any employee falling asleep at Carle Place for the entire time they had been in their respective positions, "supports that it is more likely that there had never been a violation of this policy." (*Id.* at 18–19 (citation omitted).)  As to Weisenberger, Plaintiff argues her email correspondences, conversations, and communications are inadmissible hearsay because Weisenberger "is now deceased, did not provide deposition testimony and did not give any sworn statement regarding her plan to phase Plaintiff out of her position and the reason behind Plaintiff's discharge" and reliance on her statements would "deprive Plaintiff of her day in Court."  (*Id.* at 2, 13.)  She contends a reasonable factfinder could infer that "Weisenberger harbored discriminatory animus and made false statements about Plaintiff" based on Weisenberger (1) directing "subordinates to issue a written warning to Plaintiff while, in the same breath, devising a plan to manage Plaintiff out of the company"; (2) "draft[ing] the extremely inaccurate email to Kaplan and Hall" on April 14, 2021 "with the knowledge that Plaintiff suffered a complex migraine, was out sick, had difficulty walking, and sought medical care and treatment"; and (3) the absence of "any sworn testimony from Weisenberger explaining

what exactly motivated her actions in the decision-making process." (*Id.* at 19–20.)

Upon the defendant's showing of a legitimate, nondiscriminatory reason for the employment action, the plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Bassi v. N.Y. Med. Coll.*, No. 23-278, 2024 WL 3717317, at *2 (2d Cir. Aug. 8, 2024) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *DiCesare v. Town of Stonington*, 823 F. App'x 19, 24 (2d Cir. 2020) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)) (same); *Mullins v. City of New York*, 626 F.3d 47, 53–54 (2d Cir. 2010) (applying the same framework); *see also Santamaria v. Vee Techs., Inc.*, No. 22-CV-4472, 2024 WL 1216579, at *5 (S.D.N.Y. Mar. 21, 2024) (denying summary judgment in an ADA case based on the plaintiff's evidence that the employer's nondiscriminatory reasons for termination were pretextual). A plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [non-discriminatory] reasons for its action." *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 50 (2d Cir. 2025) (quoting *Zann Kwan*, 737 F.3d at 846); *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 651 (2d Cir. 2020) (same) (citation omitted); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (same). "Also probative are whether the employee believed the conduct was permissible and any procedural irregularities." *King v. Aramark Servs. Inc.*, 96 F.4th 546, 565 (2d Cir. 2024).

When making this assessment, courts "are decidedly not interested in the truth of the allegations against [the] plaintiff" but rather "are interested in what *motivated* the employer." *Licinio v. New York*, No. 24-2564, 2025 WL 1693108, at *1 n.1 (2d Cir. June 17, 2025) (alteration in original) (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)); *see*

*also Owens v. Centene Corp.*, No. 22-2765, 2023 WL 5970954, at *2 (2d Cir. Sept. 14, 2023) (noting that the pretext inquiry is "decidedly not interested in the truth of the allegations against [a plaintiff, but only] in what *motivated* the employer" (quoting *McPherson*, 457 F.3d at 216)); *Jacobs v. N.Y.C. Dep't of Educ.*, 768 F. App'x 86, 88 (2d Cir. 2019) (finding "unavailing" the plaintiff's argument that the report underlying the adverse employment action was "factually incorrect" because "we are decidedly not interested in the truth of the allegations against plaintiff; the factual validity of the underlying imputation against the employee is not at issue" (quoting *McPherson*, 457 F.3d at 216)); *Graham*, 230 F.3d at 44 (holding that the plaintiff could not establish pretext by demonstrating that the results of a failed drug test were not "actually correct" because "[t]he key question is whether it was reasonable for the employer to rely on the test result in making its employment decision"); *Schneidermesser v. NYU Grossman Sch. of Med.*, No. 21-CV-7179, 2024 WL 4135701, at *6 (S.D.N.Y. Sept. 10, 2024) ("Where a plaintiff has been terminated for misconduct, the question is not whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination." (alterations in original) (quoting *Koleskinow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009))); *Klein v. Brookhaven Health Care Facility*, No. 17-CV-4841, 2023 WL 6619377, at *5 (E.D.N.Y. Oct. 11, 2023) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." (quoting *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187–88 (E.D.N.Y. 2008)); *Claud*, 676 F. Supp. 3d at 130 ("At this step, 'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable.'  Instead, the question is simply whether the 'articulated purpose is the *actual purpose* for the challenged employment-related

action.'" (quoting *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993))); *Carter v. TD Bank, N.A.*, No. 20-CV-1616, 2023 WL 3818589, at *8, *9 (D. Conn. June 5, 2023) ("Plaintiff's protestations that he did nothing wrong, and that both the conclusion and process of [d]efendant's ethics investigation were flawed, are not sufficient to withstand summary judgment" because "the veracity of the misconduct allegations levied against [p]laintiff is 'immaterial to the question of pretext.'" (quoting *Vasquez v. N.Y.C. Dep't of Educ.*, 667 F. App'x 326, 327 (2d Cir. 2016))).  The Second Circuit has acknowledged the "risk that false negative performance reports or arbitrary procedures may be employed to cover illegal discrimination" and that "[w]hile such practice would arguably result in a defensibly 'legitimate' reason for the adverse employment action, bizarre or duplicitous processes might strengthen a plaintiff's showing of pretext." *McPherson*, 457 F.3d at 216 n.7; *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 219–20 (S.D.N.Y. 2017) (same), *aff'd*, 706 F. App'x 44 (2d Cir. 2017); *cf. Hui-Wen Chang v. N.Y.C. Dep't of Educ.*, 412 F. Supp. 3d 229, 247 (E.D.N.Y. 2019) (granting summary judgment where "plaintiff offer[ed] no evidence of a bizarre and duplicitous process, motivated by animus based on race, ethnicity, national origin, or disability, that support[ed] an inference of pretext").

Plaintiff fails to provide evidence sufficient to find that Defendants proffered reason for termination is false and that her termination was more than likely due to her disability.  As discussed below, Plaintiffs' three arguments as to why Defendants' proffered reason is pretextual — that Defendants have offered inconsistent and varying explanations, Defendants' reason is implausible, and Defendants have failed to produce admissible evidence — rely on immaterial or irrelevant factual issues.

### 1.    Inconsistent and varying explanations

Plaintiff has pointed to examples of Defendants offering varying explanations for her termination, but the examples offered are immaterial.

An employer's inconsistent or *post hoc* reasons for firing an employee can be indicia of pretext.  *See Villetti*, 2022 WL 2525662, at *7 (concluding "various inconsistencies" between the employer's stated justifications for terminating plaintiff and the CEO's deposition testimony and in the company's decision-making process combined with temporal proximity of the termination and protected activity could support an inference of pretext); *Zann Kwan*, 737 F.3d at 847 (finding a jury could infer pretext from the inconsistent justifications given to the EEOC and in the subsequent Title VII suit, coupled with close temporal proximity of the discharge and protected activity); *EEOC v. Ethan Allen Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) ("From such discrepancies a reasonable juror could infer that the explanations given by [the defendant] at trial were pretextual, developed over time to counter the evidence suggesting age discrimination uncovered by the state investigation."); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) (noting that the pretext inquiry considers "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination").  Nevertheless, merely having multiple reasons for firing an employee does not constitute pretext where the differences among them are not materially inconsistent.  *See Bohlinger v. Abbott Lab'ys Inc.*, 843 F. App'x 374, 380 (2d Cir. 2021) (affirming that "any discrepancies" in sales director and supervisor's testimonies regarding the employer's justification were "immaterial" because they were "variations, if that, on the same theme rather than separate inconsistent justifications'"  (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001))); *Russell v. Westchester Cmty. Coll.*, No. 23-7572, 2023 WL 6162866, at *9 (S.D.N.Y. Sept. 21, 2023) (holding plaintiff failed to demonstrate "shifting" reasons for the adverse employment action where the evidence "reveal[ed] consistently that the reason for the decision . . . was because of [p]laintiff's behavior" even if different behavior examples were cited), *aff'd*, 2025 WL 1165846 (2d Cir. Apr. 22, 2025); *Giaccio v. Michael Anthony Contracting Corp.*, No. 19-CV-4492, 2022 WL 815931, at *9

(E.D.N.Y. Feb. 16, 2022) (The "varying explanations must be materially inconsistent with one another." (internal quotation marks omitted) (quoting *Matthews v. Huntington*, 499 F. Supp. 2d 258, 267 n.6 (E.D.N.Y. 2007))); *Mathews*, 499 F. Supp. 2d at 267 n.6) (collecting cases); *see also Clawson v. City of Albany Dep't of Fire & Emerg.*, No. 23-482, 2024 WL 1044531, at *3 (2d Cir. Mar. 11, 2024) (rejecting argument that inconsistencies between fire department's justification and fire chief's comments demonstrated pretext because the chief's comments amounted to "additional details" that were not inconsistent with the fire department's "initial explanation" that the adverse action was due to the plaintiff's misconduct nor "incompatible" with the fire department's argument that plaintiff "engaged in conduct unbecoming of a battalion chief"); *accord Zann Kwan*, 737 F.3d at 853 (Parker, J., dissenting) ("The record [does not] establish that the allegedly shifting reasons [the defendant] has asserted are in fact contradictory.  Rather, the shift in business focus and [the plaintiff's] poor performance are complementary — indeed the shift in focus may in fact be a cause of at least some of [the plaintiff's] performance problems.").

Even where an employer's failure to state all its reasons for an adverse action creates some indicia of pretext, a plaintiff must nevertheless show that but-for the plaintiff's protected characteristic, the adverse action would not have occurred.  *See Bassi*, 2024 WL 3717317, at *2 (affirming that the plaintiff failed to show pretext because "no reasonable jury could conclude that [d]efendants were motivated in whole or in part by discriminatory intent"); *Rinaldi v. Nice, Ltd.*, No. 19-CV-424, 2021 WL 827767, at *8 (S.D.N.Y. Mar. 4, 2021) ("[E]ven assuming that [the] [p]laintiff could establish pretext, he c[ould] [not] demonstrate that discrimination was the 'but-for' cause of his discharge."), *aff'd sub nom. Rinaldi v. Mills*, No. 21-2630, 2022 WL 17480081 (2d Cir. Dec. 7, 2022); *Palencar v. N.Y. Power Auth.*, No. 15-CV-1363, 2019 WL 4918426, at *20 (N.D.N.Y. Oct. 4, 2019) ("Even assuming . . . that inconsistencies or other indicia of pretext [we]re present, they would not here support, either alone or in conjunction with

the other evidence, an inference that discrimination . . . was the real reason for any of the[ ]

allegedly adverse actions" (alterations in original) (quoting *Timothy v. Our Lady of Mercy Med.*

*Ctr.*, 233 F. App'x 17, 20 (2d Cir. 2007)), *aff'd*, 834 F. App'x 647 (2d Cir. 2020); *see also*

*Genova v. County of Nassau*, No. 17-CV-4959, 2020 WL 813160, at *6 (E.D.N.Y. Feb. 19,

2020) ("Ultimately, . . . the question is whether the evidence relied upon in opposition to

summary judgment allows a reasonable fact-finder to determine that defendant engaged in

discriminatory conduct." (citation omitted)), *aff'd*, 851 F. App'x 241 (2d Cir. 2021).

     Plaintiff's arguments that Defendants have "shifted their approach" to explaining

Plaintiff's termination at different points in this litigation is unavailing because Plaintiff's

examples show that Defendants maintained that Plaintiff was terminated for the April 12, 2021

incident.  (Pl.'s Opp'n 15.)  Specifically, Defendants (1) stated in their interrogatory responses

that Plaintiff was terminated for "failure to comply with Defendants' attendance policies and

procedures on numerous occasions despite being counseled on the same *and for her actions on*

*April 12, 2021*," then (2) asserted during depositions that she was terminated for "*sleeping on the*

*exam table during working hours*," and now (3) contend in their moving papers that she was

"*sleeping or laying in rest with her eyes closed, with the lights out on a patient examination table*

*during her shift*," without providing any notice to her manager that she was purportedly unable to

work."  (*Id.* at 15–16 (emphasis added).)  Moreover, the detail added or removed at each stage of

the litigation are all examples of workplace misconduct that violates Defendants' policies and

thus amount to "variations . . . on the same theme rather than separate inconsistent

justifications."  *Roge*, 257 F.3d at 170; *see Russell*, 2023 WL 6162866, at *9 (finding plaintiff

failed to show employer's reasons for adverse employment action were "shifting" because the

evidence "reveal[ed] consistently that the reason for the decision . . . was because of Plaintiff's

behavior" even if different behavior examples were cited); *Giaccio*, 2022 WL 815931, at *9

(rejecting plaintiff's argument that "the reasons for his termination shifted over time" when "in fact each of the proffered reasons fall under the general umbrella of performance issues"); *see also Harrow v. St. Luke's Cornwall Hosp.*, No. 09-CV-7847, 2011 WL 13383216, at *5 (S.D.N.Y. Mar. 29, 2011) (explaining that a decisionmaker's "'difficulty in identifying . . . which factor he considered most important to his decision' does not necessarily amount to an attempt to shield improprieties sufficient to establish pretext" (quoting *Nichols v. Lewis Grocer*, 138 F.3d 563, 568 (5th Cir. 1998))), *aff'd*, 485 F. App'x 488 (2d Cir. 2012).

While the Court agrees that the parties' 56.1 Statements are muddied and at times unclear as to whether Plaintiff's violation of Defendants' attendance and lateness policies contributed to the termination decision, Defendants repeat throughout their 56.1 statement that they fired Plaintiff for the April 12, 2021 incident. (*See, e.g.*, Defs.' 56.1 ¶¶ 75, 78.)[17] In addition, the record evidence supporting the parties' 56.1 Statements, *e.g.*, Defendants' termination letter, email correspondence, and deposition testimony, amply support Defendants' proffered justification. Plaintiff admitted that she closed her eyes while she was laying on the examination table with the lights off; Ramclam reported to her superiors and HR that Plaintiff was found asleep while on duty and that when questioned about the incident, Plaintiff denied she had been sleeping and said she was "getting a headache and decided to close [her] eyes"; and the decisionmakers involved in discharging Plaintiff relied on Ramclam's report and the information provided by Forte concerning how NYULH had handled similar incidents to reach their final termination decision. *See supra* Section I.c–f; *see also Laiscell v. Bd. of Educ.*, No. 24-11, 2024

---

[17] (*See also* Defs. 56.1 ¶¶ 8–9, 11–12 (explaining in reply to Plaintiff that facts concerning Plaintiff's violations of NYULH's time and attendance policy are "presented solely to articulate the policy's guidelines and does not detract from the established fact that Plaintiff's termination was indeed due to 'sleeping' or the 'appearance' of sleeping while on the job").)

WL 5182916, at *2 (2d Cir. Dec. 20, 2024) (finding no pretext where "nothing in the record . . . suggest[ed] that the [decision-making body] did not believe that [the plaintiff] engaged in 'unacceptable and wholly unprofessional' misconduct when it elected to terminate her employment").  Moreover, despite her pretext arguments, Plaintiff asserts repeatedly in response to Defendants' 56.1 Statement that "the summary judgment record is clear that the sole reason why Plaintiff was fired was for sleeping on the exam table during work hours."[18] (Defs.' 56.1 ¶¶ 18–22, 24–32; *see id.* ¶¶ 8–9, 11–12; *see also* Pl.'s Counter 56.1 ¶ 95 (stating "The sole reason why Plaintiff was terminated was for 'sleeping on the exam table during work hours.'").

"Construing the evidence in the light most favorable to [Plaintiff]," *Radwan*, 55 F.4th at 113, Defendants' varying explanations might raise questions as to whether attendance and lateness constituted an additional reason for discharge but "[n]o reasonable jury could find on this record that [the] Defendants' proffered explanation for their decision amounted to pretext," *Russell*, 2025 WL 1165846, at *2, nor that Plaintiff's disability was the but-for cause of termination.

## 2.    Implausibility

Plaintiff's argument that there is a genuine dispute of material fact as to whether Plaintiff was actually sleeping, (Pl.'s Opp'n 16–18), is incorrect because the Workplace Conduct Policy prohibits "[s]leeping, or *the appearance thereof*, while on duty," and Plaintiff was terminated for "sleeping or *appearing to sleep* while on duty." (Ex. E at 2–3.)  No reasonable factfinder could conclude that Plaintiff laying on her side on the examination table with the lights off and her eyes closed, (Pl.'s Counter 56.1 ¶ 20; Ricciardo Tr. 139:10–23; *see* Ex. 1 ¶ 31), did not constitute misconduct under this policy.  Moreover, regardless of whether Plaintiff was asleep, the record

---

[18]  Plaintiff also states throughout her responses to Defendants' 56.1 Statement and her own 56.1 Counterstatement that time and attendance had "nothing to do with" her termination. (Pl.'s Counter 56.1 ¶¶ 100; Defs.' 56.1 ¶¶ 8–9, 11–12; *see also id.* Pl.'s Counter 56.1 ¶ 99 ("Plaintiff was not fired for violating any time and attendance policy.").)

supports that Defendants relied on and acted in response to Ramclam's report that Plaintiff had been found sleeping (and told Ramclam that she was not sleeping but had her eyes closed), (Ex. V at 2; Defs.' 56.1 ¶ 48; Pl.'s Counter 56.1 ¶ 44), and Plaintiff has offered no evidence to challenge the plausibility of their reliance.  *See Laiscell*, 2024 WL 5182916, at *2 (affirming no pretext where "nothing in the record . . . suggest[ed] that the [decision-making body] did not believe that [the plaintiff] engaged in 'unacceptable and wholly unprofessional' misconduct when it elected to terminate her employment"); *Argueta*, 2003 WL 22670915, at *5 (The "relevant question is not *what* happened [ — *i.e.*, whether the employee actually struck her coworker —] but rather, what the *decisionmakers believed* happened.").

Plaintiff's contention that Defendants stalled firing Plaintiff for ten days to "craft an alleged non-discriminatory reason for Plaintiff's termination to avoid liability," as evidenced by the draft termination letters, (Pl.'s Opp'n 17), fails because she offers no corroborating evidence from which a discriminatory motive may be inferred.  *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 32 (E.D.N.Y. 2015) (rejecting the plaintiff's argument that the employer's delay in terminating him demonstrated pretext because there was no evidence to support that the delay "was in furtherance of some alleged scheme or that [his protected characteristic] was the but-for cause of [p]laintiff's firing"); *Burke v. Royal Ins. Co.*, 39 F. Supp. 2d 251, 261 (E.D.N.Y. 1999) (concluding that the employer waiting to terminate plaintiff until after he returned from short term disability leave was sufficient to make the prima facie case of discrimination under the ADA but the "few isolated facts" regarding the timing of dismissal and the delay in termination were "wholly insufficient to raise an issue of fact for trial" as to pretext in light of the employer's proffered basis for termination).  While there is evidence that Defendants considered pausing any disciplinary action against Plaintiff until she returned from leave, (Pl.'s Counter 56.1 ¶¶ 70–73), Defendants had already begun discussing termination for the April 12, 2021 incident and there is

no evidence that Defendants' proffered reason for termination changed over time or was influenced by Plaintiff being on leave. Rather, the record suggests that Defendants were investigating whether they could terminate Plaintiff while she was on leave. *See also Patacca v. CSC Holdings, LLC*, No. 16-CV-679, 2019 WL 1676001, at *11 (E.D.N.Y. Apr. 17, 2019) ("It would truly turn the law on its head if this court found that a manager who was trying to understand his obligations under the ADA to extend a leave, was somehow violating the ADA." (citation and alterations omitted)); *O'Hara v. Mem'l Sloan Kettering Cancer Ctr.*, No. 99-CV-2658, 2000 WL 1459798, at *4 (S.D.N.Y. Sept. 29, 2000) (explaining that internal effort to document the plaintiff's "job performance problems to protect the [h]ospital from a . . . discrimination suit" was not indicative of discriminatory animus or pretext because "[i]n the current era of employment discrimination litigation it is not surprising that a supervisor who is having doubts" about the performance of an employee in a protected class "would be sensitive to the fact that she might ultimately have to prove in court that she had a basis to believe that the employee was not performing her job competently"), *aff'd*, 27 F. App'x 69 (2d Cir. 2001). Similarly, the draft termination letters alone do not support a reasonable inference of discriminatory intent because, while the content varied, each draft as well as the final letter referenced Plaintiff's April 12, 2021 conduct as the reason for termination. *Turner*, 658 F. Supp. 3d at 135–36 (E.D.N.Y. 2023) (finding that defendants' drafts of plaintiff's termination letter that contained some variation in the stated reason for termination did not demonstrate pretext because all drafts, including the final version, "reflect[ed] the [d]efendant's proffered reason for terminating [p]laintiff").

While the overlapping nature of Defendants' decision-making process relative to Plaintiff's medical episode on April 12, 2021 and subsequent medical leave supports an inference of discriminatory motive for the prima facie case, *see supra* Section II.b.i, temporal

proximity alone is not enough to demonstrate that Defendants' proffered reason is false or incredible, particularly in light of evidence that Plaintiff's April 12, 2021 conduct did violate Defendants' Workplace Conduct Policy.  *See Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 255 (D. Conn. 2019) (concluding that "[e]ven with the temporal proximity between [the plaintiff's] medical emergency and her termination, the evidence [did] not support the inference that" disability discrimination was the employer's "true motive" for termination nor that the employer's reasons — the plaintiff's serious and partially admitted misconduct — was pretextual); *cf. Shu-Chen Kuo v. Winklevoss Consultants, Inc.*, No. 16-CV-651, 2018 WL 4623023, at *17 (D. Conn. Sept. 26, 2018) ("Absent other evidence of pretext or any basis in the record to suggest that [d]efendant's decision to terminate [p]laintiff, however hasty it may have been, was motivated by discrimination, the [c]ourt declines to second-guess [d]efendant's decision to terminate [p]laintiff when it did.").

Plaintiff has failed to demonstrate implausibilities in Defendants' reason for termination that show pretext.

### 3.    Admissible evidence

Plaintiff's argument that there is a genuine dispute as to pretext because the information Forte provided to Defendants concerning termination of prior employees for sleeping on the job and "Weisenberger's email correspondences, conversations, and communications" are inadmissible hearsay is misplaced.  Although hearsay evidence may not be used to support a motion for summary judgment, *Gerzhgorin v. Selfhelp Cmty. Servs., Inc.*, No. 22-808, 2023 WL 2469824, at *2 (2d Cir. Mar. 13, 2023) (citing *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013)), Defendants have offered most of Forte's and Weisenberger's statements not for the truth of the matters asserted but to demonstrate Defendants' decision-making process that led to Plaintiff's termination and the effect they had on the listener or reader.  The challenged evidence

is therefore admissible for this purpose. *United States v. Gillier*, No. 23-6280, 2024 WL 4344732, at *2 (2d Cir. Sept. 30, 2024) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay" (quoting Fed. R. Evid. 801 advisory committee's note)); *United States v. Dupre*, 462 F.3d 131, 136–37 (2d Cir. 2006) (finding emails sent to defendants were not hearsay because they were offered "to provide context for defendants' messages sent in response to them, messages whose admissibility is not contested"); *Poppito v. Northwell Health, Inc.*, No. 15-CV-7431, 2019 WL 3767504, *3 (E.D.N.Y. Aug. 9, 2019) (dismissing the plaintiff's "attempt[] to dispute a broad swath of factual assertions" made by employer on hearsay grounds because most of the assertions were "offered not for the truth of the matter, but rather to provide insight into defendants' thought process in taking disciplinary action against [the] plaintiff").

Even if the information Forte provided was inadmissible,[19] it would be inconsequential for the pretext inquiry. Plaintiff does not dispute Defendants met with Forte, asked Forte how NYULH handled prior incidents of other employees sleeping on the job, or that Forte informed them that the employees had been terminated. Nor does Plaintiff offer any basis to cast doubt on Defendants' assertion that they relied on information Forte provided in reaching the termination decision, particularly given that contacting Forte, who worked in NYULH Employee Relations, is consistent with the Workplace Conduct Policy's directive for "supervisors [to] contact Employee & Labor Relations prior to taking disciplinary action against an employee" for policy

---

[19]   In response to Plaintiff's argument that there is no sworn testimony from Forte, Defendants provided a sworn declaration from Forte with their reply brief. (Defs. Reply 4; Forte Decl. 6–8.) Forte attests that, based on NYULH electronic records that are maintained in the course of regularly conducted business, excluding Plaintiff, the hospital system terminated nine employees for sleeping on the job from 2020 through 2023, including two in 2020, three in 2021, three in 2022, and one in 2023. (Forte Decl. ¶¶ 6–8.)

violations "to make a proper determination regarding how to address what has occurred." (Ex. E at 3.) *See Licinio*, 2025 WL 1693108, at *1 n. 1 (explaining that for the pretext inquiry, courts "are interested in what *motivated* the employer" (quoting *McPherson*, 457 F.3d at 216)); *Laiscell*, 2024 WL 5182916, at *2 (affirming no pretext where "nothing in the record . . . suggest[ed] that the [decision-making body] did not believe that [the plaintiff] engaged in 'unacceptable and wholly unprofessional' misconduct when it elected to terminate her employment" nor "that a 'bizarre or duplicitous process[ ]' led the [decision-making body] to this conclusion" (quoting *McPherson*, 457 F.3d at 216 n.7)). Plaintiff offers testimony from Palazzotto, Addeo, and Ramclam indicating that they personally did not know of any employee falling asleep at Carle Place, but this evidence does not refute that NYULH had terminated employees in their broader hospital system or even at Carle Place for sleeping while on duty or create a genuine dispute of material fact as to what motivated Defendants' termination decision.

Plaintiff's argument that a jury may infer that Weisenberger had discriminatory intent fails because she has offered no basis for such an inference to be drawn. Plaintiff points to evidence establishing that (1) on April 13, 2021, Kimura informed Ramclam and others that Weisenberger agreed that the appropriate disciplinary action was to issue a written warning to Plaintiff for sleeping while on duty and less than a day later, Weisenberger emailed Kaplan, copying Hall, "there is consideration of eliminating the position [for which Plaintiff] was hired [in] July 2018. [Plaintiff] is the only mid-level in the practice. So as it turns out this does not matter. We may be able to manage her out," (Ex. BB at 2; Defs.' 56.1 ¶ 52; Pl.'s Counter 56.1 ¶ 52); and (2) the same day Weisenberger emailed Kaplan, Ramclam emailed Weisenberger Plaintiff's message that the April 12, 2021 incident was caused by a migraine, that she was not sleeping when Gionesi found her, and was seeking medical care for a severe headache and difficulty walking, (Defs.' 56.1 ¶ 49; Pl.'s Counter 56.1 ¶ 32; Ex. 7 at 2). Although the Court

acknowledges the peculiarity of Weisenberger appearing to pursue two courses of disciplinary action simultaneously — written warning and termination — and that there is no testimony to explain Weisenberger's motives,[20] Plaintiff has offered no basis from which a reasonable jury could make the leap that Weisenberger "harbor[ed] discriminatory animus" towards Plaintiff on account of her disability.  *See Lanci v. Andersen*, No. 96-CV-4009, 2000 WL 329226, at *6 (S.D.N.Y. Mar. 29, 2000) ("[A] 'suspicious' sequence of events does not necessar[ily] allow a plaintiff's ADA claim to survive a summary judgment motion.")  The record contains no indication, for example, that Weisenberger made any discriminatory comments towards or about Plaintiff or any other disabled employee.  *See Shimanova v. TheraCare of N.Y., Inc.*, No. 15-CV-6250, 2017 WL 980342, at *4 (S.D.N.Y. Mar. 10, 2017) ("[E]vidence of discrimination against other employees may be relevant to proving discrimination." (citing S*print/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008))); *e.g.*, *Gordon-Mallett v. Mt. Sinai Hosps. Grp., Inc.*, No. 22-CV-1159, 2024 WL 1513910, at *12 (S.D.N.Y. Apr. 8, 2024) (finding inference of discrimination in termination of the plaintiff's employment where decisionmaker's "inappropriate remarks revealed animus against individuals with [the p]laintiff's protected characteristics"); *Austin v. Phone2Action, Inc.*, No. 21-CV-491, 2023 WL 6201409, at *5 (E.D.N.Y. Sept. 22, 2023) (finding evidence of pretext for gender and race discrimination where one of the decisionmakers behind plaintiff's termination "made a discriminatory remark to

---

[20]  The Court notes that other evidence supports that around the time of the April 12, 2021 incident, Defendants were considering eliminating Plaintiff's position and laying her off. For example, on April 14, 2021, in an email to Kaplan and Weisenberger, Hall wrote, "we were already planning to layoff this employee due to not needing the role."  (Ex 10 at 8; Pl.'s Counter 56.1. ¶ 65.)  Combined with Weisenberger's April 14, 2021 email to Kaplan and Hall that Plaintiff could be "manage[d] out," a reasonable factfinder could conclude Weisenberger was motivated by Defendants' interest in eliminating Plaintiff's position.  However, no reasonable factfinder could find this evidence suggestive of discriminatory intent.

another female employee around the same time [the d]efendant terminated [the p]laintiff from her position" and "that a different female employee had complained to HR that she believed the [decision-maker] treated her dismissively and disrespectfully because of her gender and race"); *Johnson v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 314, 322 (E.D.N.Y. 2014) (holding that the plaintiff failed to show an inference of discrimination because there was no indication of animus and no defendant had ever made any discriminatory comments to the plaintiff).  Instead, Plaintiff incorrectly assumes that the absence of any testimony from Weisenberger on account of her death before being deposed can alone lead to an inference of animus.  An inference of discrimination cannot rise from mere speculation or conjecture alone.  *See Blanton*, 2022 WL 1505124, at *3 ("[C]ourts 'must . . . carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'"  (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999))); *e.g.*, *Whitney v. Montefiore Med. Ctr.*, No. 21-CV-9623, 2023 WL 7386400, at *18 (S.D.N.Y. Nov. 8, 2023) (rejecting that the defendant's reason for his termination was pretext for disability discrimination because "only by speculation could one derive from" the email evidence supplied by the plaintiff "bias on the basis of disability"); *see also Cameron v. Cmty. Aid for Retarded Child., Inc.*, 335 F.3d 60, 66 (2d Cir. 2003) (rejecting the plaintiff's argument that an inference could be drawn that the complaints that led to his termination were fabricated because the inference "would be based on nothing but speculation, lacking in the 'concrete particulars' required to defeat summary judgment" (citing *Meiri*, 759 F.2d at 998)).

Because Plaintiff has not presented any basis for a reasonable factfinder to conclude that Defendants' proffered reason for terminating Plaintiff is not credible or that "her termination was actually due to discrimination," *Bassi*, 2024 WL 3717317, at *2, she has failed to meet her burden to demonstrate pretext.  *See Wein v. N.Y.C. Dep't of Educ.*, No. 18-CV-11141, 2020 WL

4903997, at *15 (S.D.N.Y. Aug. 19, 2020) (granting summary judgment on disability discrimination claims because the plaintiff "ha[d] not produced any evidence to suggest that disability discrimination played a role in — let alone was the but-for cause of — the [employer's] challenged employment actions towards him").

Accordingly, the Court grants Defendants motion for summary judgment as to Plaintiff's ADA claim.

### c.    Plaintiff's FMLA retaliation claim

Plaintiff brings a claim for FMLA retaliation, alleging that Defendants terminated her employment "for exercising her rights under the FMLA" and "firing [her] while she was on approved FMLA leave."  (Compl. ¶¶ 65–72.)

"The FMLA gives eligible employees an 'entitlement' to twelve workweeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (alteration in original) (quoting 29 U.S.C. § 2612(a)(1)(D)); *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *4 (2d Cir. Apr. 18, 2022) (same); *Greenberg v. State Univ. Hosp.*, 838 F. App'x 603, 605 (2d Cir. 2020) (similar); *see also Robbins v. Candy Dig. Inc.*, No. 23-10619, 2024 WL 5056429, at *4–5 (2d Cir. Dec. 9, 2024) ("[A]n eligible employee is entitled to take up to twelve weeks of leave in a twelve-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." (quoting 29 U.S.C. § 2612(a)(1)(D))); *Arizmendi v. Rich Prods. Corp.*, No. 22-1971, 2023 WL 4246106, at *1 (2d Cir. June 29, 2023) ("The FMLA affords qualified employees who cannot work due to a 'serious health condition' up to twelve weeks of leave in a year." (quoting 29 U.S.C. § 2612(a)(1)(D))).  It "'creates a private right of action to seek both equitable relief and money damages against any employer . . .' should that employer 'interfere with, restrain, or deny

the exercise of' FMLA rights.'" *Sista*, 445 F.3d at 174 (quoting *Nev. Dep't Hum. Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003)); *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) (same); *see Linardos v. Juthani*, No. 24-CV-962, 2025 WL 887693, at *14 (D. Conn. Mar. 21, 2025) (quoting *Sista*, 445 F.3d at 174)).  "Under the FMLA, an employer may neither interfere with an employee's exercise of this entitlement nor retaliate against an employee for exercising this entitlement."  *Greenberg*, 838 F. App'x at 605 (citing *Woods*, 864 F.3d at 166); *see also Kelly v. Hartford Fin. Servs. Grp., Inc.*, 818 F. App'x 83, 84 (2d Cir. 2020) ("FMLA claims come in at least two varieties: interference and retaliation." (quoting *Woods*, 864 F.3d at 166)); *Sista*, 445 F.3d at 175 (rejecting claims of interference and retaliation).  "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's' ability to exercise rights under the FMLA." *Woods*, 864 F.3d at 166 (citing *Graziadio*, 817 F.3d at 424); *see also Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 69 (2d Cir. 2024) (holding that "an employee is not required to demonstrate an actual denial of benefits to establish a violation of [the FMLA] and that interference or restraint alone, which includes discouragement, is enough to establish such a violation" (citation omitted)).  "At the summary judgment stage, retaliation claims brought pursuant to the FMLA are analyzed under the burden-shifting test set forth in *McDonnell Douglas*."  *Alexander v. The Bd. of Educ. of City of N.Y.*, 648 F. App'x 118, 121 (2d Cir. 2016); *see Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085, 2025 WL 704278, at *3 (2d Cir. Mar. 5, 2025) ("Like [plaintiff's] discrimination claims, his retaliation claims are analyzed pursuant to the three-step burden-shifting framework set out in *McDonnell Douglas*." (citing *Graziadio*, 817 F.3d at 429)).

### i.   Plaintiff has established a prima facie case

Defendants argue that Plaintiff cannot establish a "viable retaliation claim under the FMLA" because they "began to consider and plan for Plaintiff's termination shortly after the

April 12, 2021, incident, as early as April 14, 2021, and Plaintiff did not initiate an FMLA request until April 22, 2021."[21]  (Defs.' Mem. 10–11; Defs.' Reply 9.)  Defendants contend that Plaintiff cannot "claim an inference of FMLA retaliatory intent based on the temporal proximity" between her FMLA request and her termination on April 26, 2021 because discussion of her termination "pre-dates her protected activity."  (Defs.' Mem. 11; Defs.' Reply 9.)

Plaintiff argues that "for the purposes of this motion" Defendants have "concede[d] that Plaintiff exercised her FMLA rights, was qualified for her position, and suffered an adverse employment action" and that there is sufficient evidence to permit a reasonable factfinder to infer retaliatory intent because "the decision to fire Plaintiff was made *after* Plaintiff requested and was

---

[21]  Plaintiff alleged that "Defendants violated the FMLA by, *inter alia*, firing [her] while she was on approved leave."  (Compl. ¶ 67.)  Defendants argue that "[t]o the extent Plaintiff asserts a claim for interference with the exercise of FMLA" based on this allegation, her interference claim is "baseless" because the claim is "in essence an unsuccessful retaliation claim" and "Defendants maintain that [Plaintiff] would have been terminated whether or not she took FMLA leave."  (Defs.' Mem. 11–13.)  Plaintiff does not respond to Defendants' arguments and in her briefing repeatedly and solely refers to an FMLA retaliation claim.  Therefore, to the extent Plaintiff did intend to plead an FMLA interference claim, the Court deems the claim abandoned.  "[W]hen a counseled party moves for summary judgment, a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."  *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 257 (2d Cir. 2024) (alterations in original) (quoting *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016)); *Colbert v. Rio Tinto PLC*, 824 F. App'x. 5, 11 (2d Cir. 2020) ("[D]istrict courts frequently deem claims abandoned when counseled plaintiffs fail to provide arguments in opposition," a practice that has been "expressly approved . . . in the context of summary judgment motions[.]"); *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) ("Where a partial response to a motion [for summary judgment] is made — *i.e.*, referencing some claims or defenses but not others . . . in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." (alteration in original) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014))); *see Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (finding that claims were deemed abandoned where the plaintiff "fail[ed] to argue that they should survive [the defendant's] motion for summary judgment" while arguing against the motion as to his other claims); *see also Ziming Shen v. City of New York*, 725 F. App'x 7, 17 (2d Cir. 2018) (affirming the district court's finding that the plaintiff abandoned claims that she did not address in her opposition to summary judgment).

approved for FMLA leave, and the temporal proximity, which is sufficient for a *prima facie* showing, between Plaintiff's FMLA approval and her termination creates, at the very least, a genuine issue of fact regarding retaliatory intent." (Pl.'s Opp'n 2, 22–23.) Plaintiff contends that the "undisputed facts of the record" indicate that she "applied for FMLA leave shortly after her medical episode on April 12, 2021 and was approved for FMLA leave before her termination" and that she "was terminated on April 26, 2021, while still out on FMLA leave and able and willing to return to work that day." (*Id.* at 23; *see* Pl.'s Counter 56.1 ¶ 36.)

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004); *see Carter*, 2024 WL 2828470, at *4 (outlining requirements for prima facie case of FLMA retaliation (quoting *Graziadio*, 817 F.3d at 429)); *Arizmendi v. Rich Prods. Corp.*, No. 22-1971, 2023 WL 4246106, at *2 (2d Cir. June 29, 2023) (citing *Potenza*, 365 F.3d at 167–68) (similar); *Offor v. Mercy Med. Ctr.*, No. 21-2115, 2023 WL 2579040 (2d Cir. Mar. 21, 2023) (citing *Potenza*, 365 F.3d at 167–68) (same); *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (same). Instead of but-for causation, however, "a 'motivating factor' causation standard applies to' FMLA retaliation claims." *Stanley v. Phelon*, No. 23-731, 2024 WL 1453872, at *2 (2d Cir. Apr. 4, 2024) (quoting *Woods*, 864 F.3d at 166)); *C.C. v. Google, LLC*, No. 24-CV-7811, 2025 WL 1938809, at *12 (S.D.N.Y. July 15, 2025) ("The FMLA's causation standard is more lenient than the ADA's, requiring only that the protected activity be a 'motivating factor' in the adverse employment action, not its 'but for' cause." (quoting *Woods*, 864 F.3d at 166)).

In order to exercise rights protected under the FMLA, an employee must request FMLA

51

leave due to a qualifying illness or condition.  *See Wahl v. County of Suffolk*, 466 F. App'x 17, 20 (2d Cir. 2012); *Dighello v. Thurston Foods, Inc.*, 307 F. Supp. 3d 5, 14 (D. Conn. 2018); *Hahn v. Office & Prof'l Emps. Int'l Union, Loc. 153*, No. 13-CV-946, 2016 WL 4120517, at *5 (S.D.N.Y. July 22, 2016); *Nally v. New York*, No. 10-CV-1186, 2013 WL 2384252, at *16 (N.D.N.Y. May 30, 2013).  "An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. § 825.303(b); *Coutard v. Mun. Credit Union*, 848 F.3d 102, 109 (2d Cir. 2017) (quoting 29 C.F.R. § 825.303(b)); *Wasserman v. N.Y.C. Dep't of Educ.*, No. 24-CV-1719, 2025 WL 1906978, at *4 (S.D.N.Y. July 10, 2025) (same).  "[I]n the absence of a request for additional information, an employee has provided sufficient notice to his employer if that notice indicates reasonably that the FMLA may apply."  *Coutard*, 848 F.3d at 111; *Haynes v. City of New York*, No. 19-CV-11008, 2024 WL 5508199, at *20 (S.D.N.Y. Mar. 26, 2024) ("[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." (quoting *Lievre v. JRM Constr. Mgmt., LLC*, No. 17-CV-4439, 2019 WL 4572777, at *14 (S.D.N.Y. Sept. 20, 2019))), *report and recommendation adopted*, 2025 WL 946089 (S.D.N.Y. Mar. 27, 2025); *cf. Carman-Nurse v. Metro. Dist. Comm'n*, No. 16-CV-1987, 2018 WL 3935025, at *12 (D. Conn. Aug. 15, 2018) ("[U]nder the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." (alteration in original) (quoting *Dighello*, 307 F. Supp. 3d at 16)).

A causal connection in retaliation claims can be shown: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by

the defendant." *Natofsky*, 921 F.3d at 348 (quoting *Littlejohn*, 795 F.3d at 319 (citation omitted));

*see also Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)) (same); *Stanley*, 2024 WL 1453872, at *2 ("Proof of causation can be established either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant").

The plaintiff must provide "sufficient evidence of a causal nexus between [her] protected activity and the alleged adverse employment actions [s]he suffered." *Clark v. Coca-Cola Beverages N.E., Inc.*, No. 20-4040, 2022 WL 92060, at *5 (2d Cir. Jan. 10, 2022) (quoting *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019)). "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see Ibela v. Allied Universal*, No. 21-1995, 2022 WL 1418886, at *1 (2d Cir. May 5, 2022) ("[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (alteration in original) (quoting *Gorman-Bakos v. Cornell Co-Op Ext. of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001))); *id.* (finding that a gap of two months between a protected activity and adverse action was sufficient to plausibly allege causation); *see also Mineo v. Town of Hempstead*, No. 22-CV-4092, 2024 WL 1077874, at *9 (E.D.N.Y. Feb. 23, 2024) ("Courts in this Circuit tend to look at the temporal proximity or other connections between the protected activity, here the FMLA leave, and the alleged acts of discrimination or retaliation." (citing *Fukelman v. Delta Air Lines, Inc.*, No. 18-CV-2, 2020 WL 4587496, at *20 (E.D.N.Y. Apr. 13, 2020))), *report and recommendation adopted*, 2024 WL 1072569 (E.D.N.Y. Mar. 12, 2024); *Desiderio v.*

*Hudson Techs., Inc.*, No. 22-CV-541, 2023 WL 185497, at *4 (S.D.N.Y. Jan. 13, 2023) ("When alleged retaliation occurs in close temporal proximity to an employee's exercising of federally protected employment rights, courts have inferred a retaliatory intent in satisfaction of that pleading requirement"); *Albertin v. Nathan Littauer Hosp. & Nursing Home*, 537 F. Supp. 3d 243, 269 (N.D.N.Y. 2021) (explaining that, under the FMLA, "[d]irect evidence often involves 'discriminatory statements or actions by employees who . . . have enormous influence in the decision-making process'" (quoting *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 514 (E.D.N.Y. 2018))).

"Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Khazin v. City of New York*, No. 24-1236, 2025 WL 1091241, at *3 (2d Cir. Apr. 8, 2025) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *Offor v. Mercy Med. Ctr.*, No. 21-2115, 2023 WL 2579040 (2d Cir. Mar. 21, 2023) (same); *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) (same); *see also Khazin*, 2025 WL 1091241, at *3 (finding no inference of retaliation where defendants "demonstrated that much of the discipline that [was] the basis for [the plaintiff's] retaliation claim arose from an independent investigation" that occurred "months before" he engaged in any protected activity); *Offor*, 2023 WL 2579040, at *2 (affirming district court's determination that plaintiff failed to raise an inference of retaliation sufficient to survive summary judgment on FMLA retaliation claim where plaintiff "was already subject to disciplinary scrutiny before" she engaged in the protected activity); *DiCesare v. Town of Stonington*, 823 F. App'x 19, 24 (2d Cir. 2020) (finding no inference of FMLA retaliation where the employer took an adverse employment action based on "several work-related issues" that arose "well before [the plaintiff] took FMLA leave"); *Lue v. JPMorgan Chase & Co.*, 768 F. App'x 7, 10–11 (2d Cir. 2019) (affirming the district court's

grant of summary judgment as to the plaintiff's Title VII retaliation claim where the record showed that "[the] defendants' criticisms of [the plaintiff's] communication style and her response to feedback predated her complaints of discrimination" and there was no other "evidence of an intent to retaliate"); *Elliot-Leach v. N.Y.C. Dep't of Educ.*, 710 F. App'x 449, 452 (2d Cir. 2017) ("Because [the plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on temporal proximity to suggest retaliatory intent, her retaliation claim fails."); *Slattery*, 248 F.3d at 95 (finding no inference of retaliation where the adverse employment actions were the product of "an extensive period of progressive discipline" that began "a full five months prior to" the protected activity); *Franco v. Am. Airlines, Inc.*, No. 21-CV-5918, 2024 WL 1054865, at *18 (S.D.N.Y. Feb. 16, 2024) (finding no inference of retaliation where "it [was] clear that the decision to terminate [the p]laintiff occurred before FMLA leave request was filed" as the plaintiff received a final warning letter for misconduct over three weeks before he submitted his FMLA request and HR personnel exchanged emails about the decision to terminate plaintiff earlier on the day he requested FMLA leave), *report and recommendation adopted*, 2024 WL 1053824 (S.D.N.Y. Mar. 11, 2024), *and* 2024 WL 4524614, (S.D.N.Y. Oct. 18, 2024); *Rochelle v. AutoZoners, LLC*, No. 21-CV-1220, 2023 WL 5935835, at *2, *13–*14 (S.D.N.Y. Sept. 12, 2023) (concluding that the plaintiff's "sole reliance on temporal proximity [was] insufficient to establish an inference of retaliation due to his disciplinary history from before" he took FMLA leave, including written warnings for failing to meet sales quotas), *reconsideration denied*, 2023 WL 7019013 (S.D.N.Y. Oct. 25, 2023), *and appeal withdrawn*, No. 23-7847, 2024 WL 2704078 (2d Cir. Mar. 6, 2024); *Kastrati v. Progress of Peoples Mgt. Corp.*, No. 18-CV-6731, 2020 WL 6940991, at *5 (E.D.N.Y. Nov. 24, 2020) (finding no inference of retaliation where plaintiff received verbal warnings for poor performance before he requested leave); *Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013) (finding no prima facie

case of FMLA retaliation where the plaintiff began receiving negative evaluations in her disciplinary file before her application for FMLA leave).

As a threshold matter, neither party contests that Plaintiff's request for leave satisfied the first prong — exercise of her FMLA rights — but they dispute the timing of her request. Construing the evidence in the light most favorable to Plaintiff, the record suggests that Plaintiff attempted to take FMLA leave as early as April 14, 2021.[22] On April 14, 2021, Plaintiff informed Defendants that she was "gravely ill," getting an MRI," and was "not sure when she [would] be back"; Ramclam advised Plaintiff to initiate the FMLA process; and the next day, Plaintiff followed up with Ramclam to convey that HR told her she had to wait one week before submitting her formal FMLA leave request.  (Defs.' 56.1 ¶¶ 56–57, 62; Pl.'s Counter 56.1 ¶¶ 64–65; Ex 10 at 4–6; Ex. EE at 2; Ex. Z.)  Although Defendants received Plaintiff's formal written leave request on April 22, 2021, (Ex. NN at 2), a reasonable factfinder could conclude that the initial conversations on April 14, 2025 regarding Plaintiff's leave "reasonably apprise[d]" Defendants that Plaintiff needed "to take time off for a serious health condition."  *See Haynes*, 2024 WL 5508199, at *10, *20 (concluding the plaintiff's email to her former employer titled "vacation leave" was sufficient to show she exercised her FMLA rights because she "clearly communicated her intention to take leave" and included "expressions such as 'necessary medical days,' 'health issues,' and 'treatment'"); *Albertin v. Nathan Littauer Hosp. & Nursing Home*, 537 F. Supp. 3d 243, 258, 270 (N.D.N.Y. 2021) (concluding that the plaintiff leaving a post-it note on her supervisor's door "explaining that she needed to take FMLA leave for herself" constituted an

---

[22]  To support her argument that she applied for leave on April 12, 2021, Plaintiff relies on Hall's testimony that Plaintiff sought FMLA leave after April 12, 2021 but prior to her termination on April 26, 2021.  (*See* Pl.'s Counter 56.1 ¶ 36; Hall Tr. 40:3–41:24.)  The Court notes that Hall's testimony is not inconsistent with a finding that Plaintiff expressed intent to apply for leave as early as April 14, 2021 because Hall did not testify to a specific date.

attempt to take FMLA leave for her prima facie case of retaliation); *Debell v. Maimonides Med. Ctr.*, No. 09-CV-3491, 2011 WL 4710818, at *8–*9 (E.D.N.Y. Sept. 30, 2011) (finding factual issue as to whether plaintiff exercised her rights under the FMLA for her prima facie of retaliation where he "adduced evidence that he asked for time off to see his doctor and that he made his supervisors aware that he may be suffering from a condition that was exacerbated by at least part of his employment tasks"); *see also Carman-Nurse*, 2018 WL 3935025, at *12 (finding plaintiff exercised her FMLA rights where her employer "placed her on leave, and she was qualified for that leave" regardless of whether she initiated the request).

Assuming Plaintiff requested leave as early as April 14, 2021, Plaintiff has demonstrated that the circumstances surrounding her termination "giv[e] rise to an inference of retaliatory intent," *Potenza*, 365 F.3d at 168, based on the temporal proximity between her leave and termination. The record shows that Defendants terminated Plaintiff the day she was to return to work from her FMLA leave. The record also suggests that Defendants began discussing disciplinary action on April 13, 2021 when Kimura emailed that she and Weisenberger spoke and agreed to give Plaintiff a written warning and Weisenberger and Kaplan, who Plaintiff does not dispute were part of the decision-making process to terminate Plaintiff, emailed about termination the next day. (Ex. 8 at 2; Ex. BB at 2–3; Defs.' 56.1 ¶¶ 48, 52, 54; Pl.'s Counter 56.1 ¶¶ 44, 52, 56.) However, these preliminary discussions occurred very close in time to Defendants being put on notice that Plaintiff was requesting leave on April 14, 2021. On these facts, the Court declines to find that a reasonable factfinder would conclude that "gradual adverse job actions began *well before*" Plaintiff exercised her FMLA rights such that "an inference of retaliation does not arise." *Offor*, 2023 WL 2579040, at *2 (emphasis added) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *see also Neron v. Amedisys*

*Holding, LLC*, No. 22-CV-469, 2024 WL 1072578, at *8 (D. Conn. Mar. 12, 2024) (presuming without deciding that the plaintiff established a prima facie case because she discussed FMLA leave with the defendants "within a few short weeks" of being terminated).

Particularly in light of Plaintiff's "minimal" burden at the prima facie stage of the *McDonnell Douglas* framework, *Banks*, 81 F.4th at 270, the Court finds that Plaintiff has demonstrated a causal nexus between her FMLA leave and termination sufficient to establish a prima facia case for retaliation.

> ### ii. Defendants have proffered a non-discriminatory reason for terminating Plaintiff and Plaintiff has failed to demonstrate pretext sufficient to rebut Defendants' nondiscriminatory reason

For the reasons discussed in Section II.b.ii, Defendants have met their burden of providing a legitimate, nondiscriminatory reason for Plaintiff's termination.  Plaintiff's argument that Defendants cannot state a nondiscriminatory reason because her FMLA leave and request are "intertwined" with her medical episode on April 12, 2021 relies on a misunderstanding of the FMLA's protections.  The Second Circuit has advised that the "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave," *Sista*, 445 F.3d at 175, and the "statute gives no greater job security than that to which the employee would have been entitled prior to taking leave," *id.* at 176 (quoting *Hale v. Mann*, 219 F.3d 61, 66 (2d Cir. 2000)).  That the root cause of Plaintiff's conduct on April 12, 2021 was an illness which ultimately required her to take FMLA leave does not preclude Defendants' legitimate explanation for terminating Plaintiff's employment because her conduct violated the Workplace Conduct Policy.  *Waltman v. U.S., Inc.*, 635 F. Supp. 3d 86, 106 (D. Conn. 2022) (rejecting the plaintiff's "good-faith defense" of the HIPAA and related company policy violations that her former employer asserted were the reason for her discharge because the "[p]laintiff's rationalizations for conduct prohibited by her

employer are immaterial" to determining whether the proffered reason is pretext for retaliation under the FMLA (citation omitted)).

Plaintiff has also failed to undermine Defendants' proffered reason for discharge based on inconsistent and varying explanations, implausibilities, and lack of admissible evidence for the reasons discussed under the ADA claim. *See supra* Section II.b.iii. Moreover, while the temporal proximity of Plaintiff's termination and her FMLA leave may be sufficient to make a prima facie case, that "alone is insufficient to defeat summary judgment at the pretext stage. *Zann Kwan*, 737 F.3d at 847; *see Debell*, 2011 WL 4710818, at *9 ("If timing alone were sufficient, any employer who granted an employee leave under the FMLA would thereafter have its hands tied regarding any discipline of that employee." (citation omitted)). The record demonstrates that Defendants fired Plaintiff for conduct that predated both her FMLA request and leave and Plaintiff has not pointed to any evidence other than temporal proximity which is insufficient at this stage, *see Henderson v. GEICO*, No. 22-CV-3513, 2024 WL 4694011, at *6 (E.D.N.Y. Nov. 6, 2024) (finding no pretext where the plaintiff relied solely on the fact that "she was not officially terminated until *after* she took FMLA leave" because "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage" (alteration in original) (quoting *Kwan*, 737 F.3d at 847)), from which an inference of retaliatory intent may be drawn. *See Uttarwar*, 2025 WL 704278, at *4 (affirming grant of summary judgment on FMLA retaliation claim where the plaintiff "failed to provide evidence calling into question the legitimacy of the defendants' explanations for his termination"); *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 410 (S.D.N.Y. 2007) (concluding the plaintiff failed to demonstrate that the employer terminated him in retaliation for his exercise of FMLA rights because the employer proffered that it fired him for violating a call-in policy and the record lacked evidence that the decision was retaliatory).

Because Plaintiff has failed to offer evidence to support a basis to infer that her FMLA

leave was a "motivating factor," *Stanley*, 2024 WL 1453872, at *2, in Defendants' decision to terminate her employment nor any evidence of retaliatory intent, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim for retaliation under the FMLA.

**d.    The Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claim**

Defendants argue that Plaintiff's NYSHRL claim fails for the same reasons as her ADA claim because NYSHRL claims "are evaluated under the same standards as federal discrimination claims." (Defs.' Mem. 9–10.)

Plaintiff contends that "the causation standard governing discrimination claims under the NYSHRL is more lenient than that under the ADA" and therefore she has met the requirements for establishing the prima facie case under the NYSHRL. (Pl.'s Opp'n 20–21.)

Because the Court dismisses Plaintiffs' federal ADA and FMLA claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claim. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *Chinniah v. Fed. Energy Regul. Comm'n*, 62 F.4th 700, 703 (2d Cir. 2023) (same); *see Herron v. N.Y.C. Transit*, No. 22-989-CV, 2023 WL 4285816, at *3 (2d Cir. June 30, 2023) (finding no abuse of discretion where district court declined to exercise supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims

following dismissal on summary judgment of his FMLA retaliation and interference claims); *Blodgett v. 22 S. St. Operations, LLC*, 828 F. App'x 1, 5 (2d Cir. 2020) (affirming district court's decision declining to exercise supplemental jurisdiction over state law claims after dismissing plaintiff's ADA claims); *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims . . .").

The Court also declines to exercise supplemental jurisdiction because the NYSHRL claim would require "unnecessarily delving" into an unresolved issue of state law. *Norman v. NYU Langone Health Sys.*, No. 20-3624, 2021 WL 5986999, at *6 (2d Cir. Dec. 17, 2021) (stating that the Second Circuit has "cautioned against unnecessarily delving into non-federal legal issues in the absence of any continuing basis for federal question jurisdiction" (quoting *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001))). Historically, "claim[s] of disability discrimination under the [NYSHRL] . . . [were] governed by the same legal standards as govern federal ADA claims." *Tafolla*, 80 F.4th at 119 (second alteration in original) (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006)); *Lehey v. Northwell Health, Inc.*, No. 23-CV-4708, 2024 WL 1703697, at *3 (S.D.N.Y. Apr. 14, 2024) (same). However, the NYSHRL "was amended in 2019 to 'be construed "liberally for the accomplishment of the remedial purposes thereof," irrespective of the standards courts have applied to federal civil rights laws,'" and "is interpreted 'to align with . . . the more liberal pleading standard' applicable to the New York City Human Rights Law ("NYCHRL")." *Flanagan*, 2025 WL 1501751, at *3 (quoting *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 123 (2d Cir. 2024)); *see* N.Y. Exec. Law § 300 (requiring that the NYSHRL be construed "liberally for the accomplishment of the remedial purposes thereof").[23] *Belanger v.*

---

[23] The amendments apply to claims accruing after August 12, 2019. *See Edelman v.*

*N.Y. Univ.*, No. 21-CV-1644, 2025 WL 963308, at *21 (S.D.N.Y. Mar. 31, 2025) (discussing the more liberal post-amendment standard under the NYSHRL); *Acosta*, 2025 WL 70141, at *8 (same).  New York courts have not definitively resolved the question "of how this amendment changes standards of liability under the NYSHRL," *Cooper*, 2023 WL 3882977, at *3, but the Second Circuit has noted that the New York Court of Appeals has "constru[ed] the NYSHRL and NYCHRL claims together," *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 n.9 (2d Cir. 2025), in "[a]pplying the mandate to interpret these laws broadly," *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 451 (2024), and lower courts have treated NYSHRL and NYCHRL claims as coextensive.  *See Wright v. White Plains Hosp. Med. Ctr.*, 232 N.Y.S.3d 594, 596 (App. Div. 2025) (citing *Syeed* and analyzing the NYSHRL and NYCHRL claims together under both the *McDonnell Douglas* framework traditionally applied to NYSHRL claims and the "newer mixed-motive framework" typically applied to NYCHRL claims); *Hunold v. City of New York*, 216 N.Y.S.3d 550, *6 n.4 (Sup. Ct. 2024) ("Although post-amendment case law is limited, courts interpreting discrimination claims under the NYSHRL have begun to turn to interpretations of the NYCHRL for guidance."  (citations omitted)); *see also Herrera v. Syracuse Univ.*, No. 24-CV-245, 2025 WL 874734, at *15 (N.D.N.Y. Mar. 20, 2025) (noting that "New York state courts have recently treated [NYSHRL and NYCHRL claims] as coextensive" (citing *Syeed*, 41 N.Y.3d at 452)).  Some courts in this Circuit, including this Court, *see Passante v. Cambium Learning Grp.*, No. 23-CV-4060, 2024 WL 4171026, at *5–7, *9–10 (E.D.N.Y. Sept. 12, 2024), "have interpreted the amendment as rendering the standard for claims closer to the standard of

---

*NYU Langone Health Sys.*, 141 F.4th 28, 45 n.9 (2d Cir. 2025), and therefore apply to Plaintiff's claims as the events that give rise to her allegations occurred in 2021.  *See Flanagan v. Girl Scouts of Suffolk Cnty., Inc.*, No. 23-7900, 2025 WL 1501751, at *3 (2d Cir. May 27, 2025) (applying August 12, 2019 effective date); *Golston-Green v. City of New York*, 123 N.Y.S.3d 656, 665 n.1 (App. Div. 2020) (same).

the NYCHRL." *Cooper*, 2023 WL 3882977, at *3 (internal quotation marks and citation omitted); *Desiderio*, 2025 WL 1285278, at *9 (collecting cases); *see also Acosta*, 2025 WL 70141, at *8 n. 6 (explaining that "case law . . . has not definitively resolved whether the effect of the 2019 amendment is to make the NYSHRL's standard *identical* to that of the NYCHRL — or merely closer to it").  Although the Second Circuit has not yet "resolve[d] the impact of these amendments," *Cooper*, 2023 WL 3882977, at *3, in a recent summary order the Second Circuit analyzed post-amendment claims under the NYSHRL and the NYCHRL together.  *See Valerio v. Metro. Transp. Auth.*, No. 24-1614, 2025 WL 686028, at *3 (2d Cir. Mar. 4, 2025) ("We thus discuss both [the NYSHRL and NYCHRL] claims together while recognizing that they are separate and independent claims." (citation omitted)); *see also Flanagan v. Girl Scouts of Suffolk Cnty., Inc.*, No. 23-7900, 2025 WL 1501751, at *5 (2d Cir. May 27, 2025) (applying "'more liberal pleading standard' applicable to" NYCHRL claims to an NYSHRL discrimination claim).

"[I]n the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York."  *Norman*, 2021 WL 5986999, at *6 (alteration in original) (quoting *Giordano*, 274 F.3d at 754); *see Cruz*, 2025 WL 551809, at *15 (granting summary judgment on federal disability discrimination claim and declining to exercise supplemental jurisdiction over "remaining NYSHRL and NYCHRL claims, which are better suited for the state courts of New York"); *Nikolakopoulos v. Macy's Inc.*, No. 20-CV-1641, 2022 WL 3903595, at *27 (S.D.N.Y. Aug. 30, 2022) (declining to exercise supplemental jurisdiction over the plaintiff's NYSHRL and NYCHRL claims after dismissing ADA and FMLA claims on summary judgment because the claims "implicate different and at times uncertain legal frameworks and standards" and explaining the NYSHRL amendments as an example of how the "legal frameworks" of the claim "diverge, often substantially, from those

governing [the federal] claims" (quoting *Williams* v. *Geiger*, 447 F. Supp. 3d 68, 88 (S.D.N.Y. 2020))); *Fitzgerald v. We Co.*, No. 20-CV-5260, 2022 WL 952963, at *10 (S.D.N.Y. Mar. 30, 2022) (declining to exercise supplemental jurisdiction over NYSHRL and NYCHRL claims after granting summary judgment on federal ADA, FMLA, and Title VII claims because they "employ a different, more liberal substantive standard in resolving both gender- and disability-based discrimination, retaliation, and hostile work environment claims"); *Brantman v. Fortistar Cap., Inc.*, No. 15-CV-4774, 2017 WL 3172864, at *12 (S.D.N.Y. July 22, 2017) (declining exercise of supplemental jurisdiction over NYHSRL claims following grant of summary judgment on ADA and Title VII claims "[i]n interest of comity" (citation omitted)).

Accordingly, the Court dismisses Plaintiff's NYSHRL claim without prejudice.

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment on Plaintiff's ADA and FMLA claims and dismisses both claims, dismisses without prejudice Plaintiff's NYSHRL claim, and directs the Clerk of Court to enter judgment for Defendants and close this case.

Dated:  August 4, 2025
        Brooklyn, New York

                                        SO ORDERED:


                                        _____/s/MKB_____
                                        MARGO K. BRODIE
                                        United States District Judge